Todd R. Johnston, OSB 992913
tjohnston@hershnerhunter.com
Alexandra P. Hilsher, OSB 114218
ahilsher@hershnerhunter.com
Hershner Hunter, LLP
675 Oak St., Ste. 400
Eugene, OR 97401
Telephone: (541) 686-8511
Facsimile: (541) 344-2025

Hayden K. Rooke-Ley, OSB 242890*
Hayden.k.rookeley@gmail.com
1988 NW Savier St.
Portland, OR 97209
Telephone: (541) 514-0223
*Application for admission forthcoming

Brendan Ballou, DC Bar No. 241592*
brendan@publicintegrityproject.com
Public Integrity Project LLC
1763 Columbia Rd., Ste. 175 #357
Washington DC 20009
Telephone: (917) 684-3900
*Pro hac vice application forthcoming

Of Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| KAREN STAPLETON, as guardian *ad litem* for JANE STAPLETON; DAN McGEE, MD, PhD, an individual and licensed medical practitioner; and EUGENE EMERGENCY PHYSICIANS, P.C., an Oregon professional corporation; | Case No. 6:26-cv-00684-MTK |
| | Plaintiffs Jane Stapleton, Dan Mcgee, MD, PhD, and Eugene Emergency Physicians, PC's |
| Plaintiffs, | MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| PEACEHEALTH, a Washington nonprofit corporation; APOLLOMD, INC., a Georgia corporation; APOLLOMD BUSINESS SERVICES, LLC; LANE EMERGENCY PHYSICIANS LLC, an Oregon limited liability corporation; and DOES 1 - 5; | *Oral Argument Requested* |
| | *Expedited Hearing Requested* |
| Defendants. | |

Page 1 – PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**CERTIFICATION**

In compliance with LR 7-1, the parties made a good faith effort through video, email and telephone conferences to resolve the dispute and have been unable to do so.

**MOTION**

Pursuant to FRCP 65, Plaintiffs move this Court for a preliminary injunction to:

1.      Preserve the status quo in the provision of emergency medical services at Sacred Heart Medical Center at Riverbend, Cottage Grove Community Medical Center, and Peace Harbor Medical Center (collectively, the "PeaceHealth Hospitals") by Plaintiff Eugene Emergency Physicians, P.C. ("EEP") until this Court is satisfied that Defendant PeaceHealth ("PeaceHealth") will be able to legally provide adequate emergency medical services to the community and will not put the community at risk;

2.      Prohibit Defendants ApolloMD, Inc. ("ApolloMD"), Lane Emergency Physicians LLC ("LEP"), and ApolloMD Business Services, LLC ("ApolloMD MSO") from violating Oregon's prohibitions on the foreign and corporate practice of medicine and from conducting business illegally in Oregon; and

3.      Dissolve LEP—a front organization for ApolloMD's illegal foreign and corporate practice of medicine—or, in the alternative, bar LEP from conducting business in Oregon.

Because Plaintiffs and the community will suffer irreparable harm if this dispute is taken up in the normal course, pursuant to FRCP 43 and 65, Plaintiffs also move the Court for an order expediting an evidentiary hearing of this matter to a date available on the Court's docket from April 20 through April 30 or as near thereto as possible.[1]

---

[1] A separate motion for an order allowing limited interim discovery will be filed in conjunction with this motion.

Page 2 – PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Further, as described in more detail below, Defendants' have demonstrated significant credibility issues that warrants both discovery and live testimony so that the Court can evaluate the evidence and witnesses firsthand.  Further, relevant witnesses (some of whom are PeaceHealth employees) who fear retaliation by Defendants and who have been reluctant to voluntarily provide declarations should be afforded the opportunity to provide their testimony to the Court.  This matter also involves a topic of extraordinary community import and interest which further supports conducting a hearing.

These motions are supported by the Declarations of Dr. Brad Anderson (Eugene Emergency Physicians, P.C.); Dr. Corey Orton (Radiology Associates, P.C.); Dr. Judith Sabah (Eugene Eye Care Associates, P.C.), Dr. Allan Hunter (Oregon Eye Consultants, P.C.); Dr. Robert M. Beardsley (Oregon Eye Consultants, P.C.); Christopher Rompala, RN, BSN (Oregon Nurses Association); Rose Fantozzi, RN, BSN (Oregon Nurses Association); Brett Deedon (Local 851 Lane Professional Firefighters); Karen Stapleton; and Laurie Parrish, the Complaint on file in this action, and the below Memorandum of Law.

## MEMORANDUM OF LAW

I.     **<u>Introduction</u>.**

For 35 years, EEP has provided emergency medical services to hospitals in the Eugene area, including at the three PeaceHealth Hospitals. On February 3, 2026, PeaceHealth notified EEP that it would allow its contract to expire, and replace EEP with ApolloMD.  This is more than a proposal to change doctors; PeaceHealth is breaking the law and intends to continue to do so. This is because the companies that PeaceHealth may contract with—ApolloMD, ApolloMD MSO, and their front organization, LEP—all violate Oregon's prohibition on the "corporate practice of medicine," which is meant to ensure that medical decisions are made by doctors, whose obligations are to their patients, not by corporations, whose obligations are to their shareholders.  Moreover, ApolloMD and ApolloMD MSO are not even licensed to do business in the state.

Given the obvious illegality and significant threat to the public, interested public officials, including members of the Oregon Legislature and the Oregon Governor, have tried for months to elicit Defendants' cooperation and information relating to their purported plans for emergency services in the area. Defendants have refused to produce their underlying agreements or other substantive information. The information they have provided is sometimes contradictory but, regardless, demonstrates that they are violating Oregon law and have lied to the public and public officials about what they are doing.

Plaintiffs Karen Stapleton, as parent and Guardian *ad litem* of Jane Stapleton ("Jane"), EEP, and Dr. Dan McGee filed the underlying lawsuit against Defendants to prohibit further illegal activity and avoid the irreparable harm that will result. Because of the timeline for vetting, hiring and credentialling qualified emergency physicians, there is significant urgency to the issuance of a preliminary injunction to maintain the status quo. The scheduled departure of every current emergency physician serving at PeaceHealth Hospitals is in approximately two to three months. If action is not taken, not only will Defendants have no likelihood of adequately staffing emergency rooms with full-time resident physicians but those who are currently working have, and will continue to, make plans to leave. In other words, without preliminary injunctive relief, the harm that this litigation is directed at avoiding will be suffered just by virtue of delay. Declaration of Brad Anderson ("Anderson Dec.") ¶ 19.

## II.     **Background Facts.**

EEP is an Oregon professional corporation that provides emergency medical services and includes approximately 41 healthcare providers who live and work in and around Lane County, Oregon. Anderson Dec. ¶¶ 1, 18. Dr. McGee is a shareholder and physician with EEP, and has lived in Lane County and practiced emergency medicine here since 2013. *Id*. at ¶ 21. He has

practiced with EEP at PeaceHealth Hospitals since 2015 and participated in PeaceHealth's purported RFP process described below.  *Id*.  Jane is a minor who has lived in Eugene her entire life, a former patient of EEP at PeaceHealth, and is likely to need emergency medical care in the future.  Declaration of Karen Stapleton ¶¶ 2-4.

EEP provides emergency medical staff to the PeaceHealth Hospitals, and has done so for over 35 years.  Anderson Dec. at ¶ 18.  In late 2025, PeaceHealth suddenly announced that it would not renew its contract with EEP but would instead issue a Request for Proposal ("RFP") from potential providers of emergency medical services.  *Id*. at ¶ 16.  EEP participated in the RFP process in good faith, while PeaceHealth kept its evaluation and the process generally secret.  *Id*. at ¶ 16.

On February 3, 2026, PeaceHealth shocked Plaintiffs, the Eugene medical community, and the general public by announcing that it would end its long-standing relationship with EEP starting in May 2026.  *Id*. at ¶ 17.  At no point before the announcement did PeaceHealth identify any specific deficiencies for EEP (or give EEP any opportunities to address those deficiencies), before it ended their relationship.  *Id*. PeaceHealth further announced that, instead of continuing to contract with EEP, it had awarded a contract to ApolloMD, a Georgia corporation.  *Id*.  ApolloMD is not registered to conduct business in Oregon, is owned by various corporations and individuals, none of whom appear to be Oregon-licensed physicians, and has no other presence or connection to Oregon.  Declaration of Laurie Parrish ("Parrish Dec.')  ¶ 4.

Not only was PeaceHealth's decision shocking, it was, and still is, plainly contrary to Oregon law.  Accordingly, the Oregon Governor, members of the Legislature, and other groups all expressed their concern and sought more information from PeaceHealth and ApolloMD.  Anderson Dec. at ¶¶ 13-14, Exs. 2-4.  Both entities refused to provide copies of the

Page 5 – PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

underlying agreement(s) between Defendants and, instead, provided conflicting and obfuscated accounts of which ApolloMD entity would purportedly provide medical services beginning in June. *Id*.   Regardless of which  explanation is to be believed, the limited information that PeaceHealth and ApolloMD did disclose demonstrates that they are violating Oregon's prohibitions on the foreign and corporate practice of medicine.

For example, PeaceHealth admits that it awarded a contract for the provision of medical services to ApolloMD.  Anderson Dec. at ¶ 13, Exs. 2-3.  PeaceHealth put out a "Fact Sheet" on March 3, 2026, which it recently amended, in which it repeatedly confirmed that ApolloMD is its contracting partner and made clear it was the entity that will run the PeaceHealth Hospitals' emergency departments:

- "PeaceHealth is transitioning ED physician management services from Eugene Emergency Physicians (EEP) to ApolloMD."

- "PeaceHealth selected ApolloMD after completing a comprehensive and competitive review process that included proposals from multiple physician groups, including Eugene Emergency Physicians."

- "ApolloMD was chosen because it brings depth of experience, operational infrastructure, and demonstrated outcomes that align with PeaceHealth's long-term goals for access and quality."

- "ApolloMD has extensive experience operating high-volume, high-acuity emergency departments including as a service provider[.]"

- "PeaceHealth requires a partner with a proven ability to stabilize operations in rapidly growing emergency settings.  ApolloMD's record of managing high-volume environments distinguishes the organization . . ."

- "ApolloMD's ability to combine national best practices with local engagement is central to PeaceHealth's belief that the organization is the right choice for Lane County's emergency departments."

- "PeaceHealth and ApolloMD also share a commitment to maintaining well-staffed departments, emphasizing that competitive compensation is essential to attracting and retaining high quality clinicians."

- "ApolloMD has a strong track record of recruiting and retaining emergency physicians[.]"

- "After careful scoring and deliberation, the committee recommended awarding the contract to ApolloMD as the proposal best aligned with PeaceHealth Oregon's current and future needs."

*Id.* at ¶ 13, Ex. 3.

ApolloMD has recently claimed that it will operate in Oregon through an affiliated management services organization, ApolloMD MSO, which will then contract with a sole-member limited liability company, which it named Lane Emergency Physicians (LEP).[2] Anderson Dec. ¶ 14, Ex. 4. Despite its name, LEP has no connection to Lane County and was created by ApolloMD *after* ApolloMD was awarded the contract by PeaceHealth and solely in an effort to feign compliance with Oregon law. *See* Anderson Dec. ¶¶ 13, Exs. 2-3; Parrish Dec. ¶ 5, Ex. 5. In other words, LEP is simply a front for ApolloMD, which is not itself authorized to provide medical services in the state. Anderson Dec. ¶¶ 13, Exs. 2-3; Parrish Dec. ¶ 4. Evidencing this fact are Defendants' own admissions, coupled with the fact that LEP did not even exist at the time that PeaceHealth awarded a contract to provide medical services to ApolloMD.[3] *See* Parrish Dec. ¶ 5, Ex. 5; Anderson Dec. ¶ 17.

Not only was LEP was created after PeaceHealth awarded a contract to ApolloMD, LEP's principal place of business and mailing address are at the same location as the other ApolloMD entities in Atlanta, Georgia. *Id.* According to ApolloMD, the sole owner, member, manager, and every officer of LEP is Dr. Johne Chapman. Anderson Dec. ¶ 14, Ex. 4. Dr. Chapman appears to be a resident of Illinois and practices medicine in the Chicago area, has frequently worked as a

---

[2] A few days after the public announcement that a new contract had been reached between PeaceHealth and ApolloMD, ApolloMD unlawfully registered an entity with the Oregon Secretary of State called "Lane Emergency Physicians LLC," in a clear effort to trade on the goodwill that EEP (Eugene Emergency Physicians, LLC) has built over decades. Parrish Dec. ¶ 5, Ex. 5.

[3] Defendants have repeatedly said they entered into a contract but have refused to disclose it.

medical director at numerous ApolloMD physician staffing locations across the country, and has been recognized as the company's "Medical Director of the Year." Parrish Dec. ¶ 2, Ex. 1.

As yet more evidence that it is ApolloMD, not LEP, that is in charge, ApolloMD has, on its website, in public comments, and through recruiters, begun seeking to hire physicians to replace EEP and work for ApolloMD. Anderson Dec. ¶ 15, Ex. 5. In fact, in explaining its decision to contract with ApolloMD, PeaceHealth stated publicly that, "[s]ince early February, *ApolloMD* has made substantial investments in physician recruitment and operational preparedness[,]" and "will ensure that a core group of physicians are physically present within the Lane County service area at all times, beginning as of the transition dates." Anderson Dec. ¶ 13, Ex. 2. PeaceHealth has also touted ApolloMD's—not LEP's—"demonstrated success in recruitment and retention" of clinicians, "strong record of retaining local clinicians," and "leadership development and mentoring programs" for clinicians. *Id*. PeaceHealth has further explained that ApolloMD, not LEP, will provide "detailed patient satisfaction tracking and training tools with clear accountability at the clinician level." *Id*.

Further evidencing that ApolloMD, not LEP, is in charge, PeaceHealth admitted that it awarded a contract to "ApolloMD" due to its hiring and retention success, as well as for its purported commitment to clinical care. *Id*.; *see also* Ex. 3. Specifically, in multiple public statements, PeaceHealth publicly noted "ApolloMD's" "programs for benchmarking, monitoring and supporting adherence to clinical quality metrics, ensuring consistent, evidence-based care across sites." Anderson Dec. ¶ 13, Exs. 2-3. It further highlighted "ApolloMD's" use of "deploying regional leadership as 'boots on the ground' workers to ensure true understanding of community needs and ensure care reflects those needs." *Id.* PeaceHealth also promised that "ApolloMD" will improve processes that "directly impact access and patient flow." *Id*. In all

these public statements, PeaceHealth admits that its contracting partner is ApolloMD, not the fictional LEP. *Id*.

As explained in more detail below, there can be no serious dispute that Defendants have and continue to violate Oregon law, have harmed and will continue to harm Plaintiffs and that, without temporary injunctive relief, will irreparably harm Plaintiffs, in addition to putting the entire community at risk. *Id*. at ¶¶ 2-12, 20; Declaration of Corey Orton ("Orton Dec.") ¶¶ 2-7; Declaration of Judith Sabah ("Sabah Dec.") ¶¶ 2-6; Declaration of Allan Hunter ("Hunter Dec.") ¶¶ 2-7; Declaration of Robert Beardsley ("Beardsley Dec.") ¶¶ 2-7; Declaration of Christopher Rompala ("Rompala Dec.") ¶¶ 2-10; Declaration of Rose Fantozzi ("Fantozzi Dec.") ¶¶ 2-9; Declaration of Brett Deedon ("Deedon Dec."); ¶¶ 2-8.

## III. **Legal Analysis**.

### A. **Background on Oregon's Prohibition on the Corporate Practice of Medicine**

Oregon, like most states, has long prohibited the "corporate practice of medicine," and requires that medical practices be majority owned and controlled by physicians licensed to practice in the state, rather than by for-profit corporations.[4]  This prohibition makes sense, as medical decisions should be made by doctors whose professional obligations are to their patients, rather than to corporations whose obligations are to their shareholders.

---

[4] The Oregon Supreme Court first established its CPOM doctrine in 1947, ruling that a corporation whose owners were not licensed optometrists could not operate an optometry practice through employing licensed optometrists as employees. *State ex rel. Sisemore v. Standard Optical Co. of Or.*, 182 Or 452, 188 P2d 309 (1947).  In 1995, the Oregon Court of Appeals clarified that *Sisemore* did not preclude a licensed entity from owning any ownership in a medical practice. *Neiss v. Ehlers*, 135 Or App 218, 231, 899 P2d 700 (1995).  In 1997, the Oregon Legislature codified the State's CPOM ban, requiring that professional corporations organized for the purposed of practicing medicine are majority owned and governed by physicians licensed to practice medicine in Oregon.  ORS 58.500 (formerly ORS 58.375).

In 2025, the Oregon Legislature closed a loophole that corporations have exploited to circumvent the physician-ownership requirements.  *See* S.B. 951, *codified at* ORS 676.555 *et seq.* Under the so-called "friendly" or "captive" physician loophole, a non-professional corporation functionally controls the medical practice through a separate management services organization, or "MSO," an entity traditionally formed to provide ancillary, back-office services to a medical practice.  The MSO creates a physician-owned medical practice as a front (in this case, LEP). The MSO identifies its own "friendly physician," (Dr. Chapman) assists the physician in becoming licensed in the state, and installs the physician as the sole owner of the medical practice. The friendly physician is often serially licensed in dozens of states nationwide and may never set foot in the state, much less the medical practice. With this "friendly physician" in place, the MSO enters into a "management services arrangement" and other contracts that subordinate the medical practice to the MSO.

**The "Friendly Physician" Model**



S.B. 951, passed in 2025, closed the friendly physician loophole.  S.B. 951, *codified at* ORS 676.555 *et seq.*  It did so by banning many of the tactics MSOs use to subordinate friendly physicians and medical practices to them.  *Id.*  These restrictions were widely recognized as the strongest in the nation, and Oregon was heralded as the first state in the nation to clamp down on the increasingly common friendly physician scheme.

Most fundamentally, it is illegal for ApolloMD and ApolloMD, MSO, to control or have de facto control over any entity providing medical services.  ORS 676.555.  Specifically, ORS 676.555 prohibits management service organizations, from exercising actual or "de facto control over administrative, business or clinical operations of a professional medical entity in a manner that affects the professional medical entity's clinical decision making or the nature or quality of medical care that the professional medical entity delivers."  ORS 676.555(2)(a)(G). The statute provides a non-exhaustive list of prohibited conduct that would amount to *de facto* control, including exercising "ultimate decision-making authority" over a range of activities of the medical practice, such as hiring and firing; work schedules and compensation; clinical standards or policies; client or customer billing and collection; advertising services as the MSO; and negotiation and executing contracts with third party entities.  *Id*.

Defendants have unequivocally admitted that ApolloMD will control these prohibited elements of the future medical practice and Defendants' subsequent scheme to circumvent the law using LEP, coupled with their violations of several other Oregon laws, should be enjoined as described below.  Because Defendants have and continue to violate Oregon law, regardless of whether they attempt to employ a "friendly physician" scheme or not, and Plaintiffs and the community are and will be harmed as a result, a preliminary injunction, preserving the status quo, is appropriate.

B.      **Plaintiffs are entitled to a preliminary injunction maintaining the status quo and prohibiting further violations of Oregon law.**

Because Defendants are violating Oregon's ban on the corporate practice of medicine, to the irreparable harm of Plaintiffs and the community, a preliminary injunction preserving the status quo and prohibit Defendants from further violating the law is required.

Page 11 – PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1.   **Legal Standard.**

To obtain a preliminary injunction, a party "must meet one of two variants of the same standard." *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The original standard was established in *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008): "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." An alternative variant applies where a plaintiff only shows "serious questions going to the merits" instead of likelihood of success; in that case, "a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Alliance of the Wild Rockies*, 865 F.3d at 1217 (internal quotation marks omitted).[5]

Whatever standard is applied, these factors weigh in favor of Plaintiffs and issuance of a preliminary injunction. Accordingly, for the reasons described below, the Court should issue a preliminary injunction maintaining the status quo and prohibiting Defendants' continuing violations of law.

2.   **Plaintiffs are likely to prevail on the merits of their claims or, at the very least, have raised serious questions going to the merits.**

Plaintiffs' Complaint seeks declarations (1) that the purported agreement(s) between Defendants are in violation of ORS 676.555 and consequently void; (2) that the formation of LEP

---

[5] "[I]n deciding a motion for a preliminary injunction, the Court has broad discretion to consider all arguments and evidence, including hearsay and other inadmissible evidence, [and] declarations from interested parties[.]" *Brinton Bus. Ventures, Inc. v. Searle*, 248 F. Supp. 3d 1029, 1032 (D. Or. 2017) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *see also Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept . . . hearsay for purposes of deciding whether to issue the preliminary injunction.").

was unlawful pursuant to ORS 58.500 (formerly ORS 58.375) and ORS 676.555 and consequently LEP is not a legal entity permitted to conduct business in Oregon; and (3) that the advertising and offers of employment by ApolloMD, ApolloMD MSO, or LEP are in violation of ORS 676.555. Consequently, and because the violations of law will cause irreparable harm to Plaintiffs and the public, Plaintiffs seek preliminary injunctive relief to avoid or mitigate the same. As outlined below, because Defendants have violated and intend to violate numerous Oregon laws, the evidence demonstrates that Plaintiffs are likely to prevail on the merits of their claims or, at the very least, have raised serious questions going to the merits.

> a. **ApolloMD and ApolloMD MSO are illegally conducting business in Oregon.**

Fundamentally, any foreign company must be registered in Oregon to legally conduct business in Oregon. ORS 60.701(1). Neither ApolloMD nor ApolloMD, MSO are registered to do business in Oregon, and they cannot legally conduct business in the state. Notwithstanding this, Defendants have admitted, among other things, that "PeaceHealth is transitioning ED Physician management services from Eugene Emergency Physicians (EEP) to ApolloMD." Anderson Dec. ¶ 13, Ex. 3 (emphasis added). Further, even if ApolloMD and ApolloMD MSO could legally do business in Oregon, Defendants have repeatedly admitted, and in other places contradicted, the fact that ApolloMD is the entity that will be in charge of delivering emergency medical services, in lieu of EEP. [6] Anderson Dec. ¶¶ 13-14; Exs. 2-4; Parrish Dec. ¶ 3, Exs. 2-4.

---

[6] In order to practice medicine in Oregon, an entity must be majority owned and controlled by physicians licensed in Oregon. ORS 58.500 (formerly ORS 58.375). ApolloMD is not majority owned and controlled by physicians licensed in Oregon and, to the best of Plaintiffs' knowledge (because Defendants have refused to disclose any substantive information), does not have a single owner who is a licensed physician in Oregon. Accordingly, ApolloMD cannot lawfully be the "professional medical entity" providing medical services at PeaceHealth Hospitals because it is not majority owned by Oregon-licensed physicians.

ApolloMD's activity to date has been illegal and, even if Defendants intend to employ a scheme involving the front LEP, they are still violating Oregon law, as described below.

b.    **ApolloMD and ApolloMD MSO are violating Oregon law by controlling the administrative, business or clinical operations of the professional medical entity (LEP).**

Even if ApolloMD and ApolloMD MSO could legally do business in Oregon, and form some sort of relationship with the front organization, LEP, Oregon law contains numerous provisions intended to ensure that the physician owners remain in control of their medical practices and are not usurped by separate management companies or other corporations. Most broadly, ORS 676.555(2)(a) expressly prohibits management services organizations from, among other things, "exercising de facto control over administrative, business or clinical operations of a professional medical entity in a manner that affects the professional medical entity's clinical decision-making or the nature or quality of medical care that the professional medical entity delivers." De facto control includes, but is not limited to, the following conduct:

(i) Hiring or terminating, setting work schedules or compensation for, or otherwise specifying terms of employment of medical licensees;

(ii) Setting clinical staffing levels, or specifying the period of time a medical licensee may see a patient, for any location that serves patients;

(iii) Making diagnostic coding decisions;

(iv) Setting clinical standards or policies;

(v) Setting policies for patient, client or customer billing and collection;

(vi) Advertising a professional medical entity's services under the name of an entity that is not a professional medical entity;

(vii) Setting the prices, rates or amounts the professional medical entity charges for a medical licensee's services; or

(viii) Negotiating, executing, performing, enforcing or terminating contracts with third-party payors or persons that are not employees of the professional medical entity.[7]

ORS 676.555(2)(a)(G).

Here, ApolloMD and ApolloMD MSO—the entities purportedly replacing Plaintiff EEP—have de facto control over LEP and are violating many of the enumerated prohibitions of the law. In fact, Defendants themselves have repeatedly characterized their arrangement in terms that expressly violate the law, stating that ApolloMD—not LEP—is the entity in control. For example, Defendants have admitted that ApolloMD, not LEP, is negotiating and contracting with PeaceHealth and is in charge of personnel and hiring for LEP:

1.      "PeaceHealth is transitioning ED [Emergency Department] physician management services from Eugene Emergency Physicians (EEP) to ApolloMD." Anderson Dec. ¶ 13, Ex. 3. This violates the statute's prohibition on MSOs negotiating with persons that are not employees of the professional medical entity. ORS 676.555(2)(a)(G)(viii).

2.      ApolloMD responded to a request for proposal from PeaceHealth to provide emergency medical services at the PeaceHealth Hospitals. *Id*. at ¶¶ 13-14, Exs. 2-4. Again, this violates the statute's prohibition on MSO's negotiating with persons that are not employees of the professional medical entity. ORS 676.555(2)(a)(G)(viii).

3.      PeaceHealth referred to "ApolloMD" as the "physician group" to which it awarded the contract. *Id*. at ¶ 13, Ex. 3 ("PeaceHealth selected ApolloMD after completing a

---

[7] ORS 676.555 contains additional provisions to guard against the friendly physician scheme. This includes a "dual compensation" ban: a friendly physician who is the sole-owner of the professional medical entity may not be on the payroll or otherwise compensated by the MSO. ORS 676.555(2)(a)(A)-(F). The statute also prohibits the MSO from binding the physician's owners to a "stock transfer restriction agreement"—a contractual arrangement that allows the MSO to control the equity transfer of the friendly physician. *Id*. In addition, the law prohibits the MSO from acquiring or financing the acquisition of the majority of shares in the medical practice. *Id*

comprehensive and competitive review process that included proposal from multiple physician groups, including Eugene Emergency Physicians."). Again, this violates the statute's prohibition on MSO's negotiating with persons that are not employees of the professional medical entity. ORS 676.555(2)(a)(G)(viii).

4.      PeaceHealth is contracting with ApolloMD to operate and manage its emergency departments. *Id*. ("PeaceHealth requires a **partner** with a proven ability to stabilize **operations** in rapidly growing emergency settings. ApolloMD's record of **managing** high-volume environments distinguishes the organization as one capable of meeting today's challenges and planning for the future." (Emphasis added.)). Again, this violates the statute's prohibition on MSO's negotiating with persons that are not employees of the professional medical entity. ORS 676.555(2)(a)(G)(viii).

5.      ApolloMD is offering to hire physicians in Oregon, including on its website and by engaging recruiting agencies to locate and hire physicians in Oregon, making clear that the employer is ApolloMD. *Id*. at ¶ 15, Ex. 5; Parrish Dec. ¶ 3, Exs. 2-4. This violates the statute's prohibition on MSOs "[h]iring or terminating, setting work schedules or compensation for, or otherwise specifying terms of employment of medical licensees." ORS 676.555(2)(a)(G)(i).

6.      PeaceHealth and ApolloMD have made it clear that they, not LEP, will dictate staffing and compensation of physicians in its emergency departments. Anderson Dec. at ¶ 13, Ex. 3 ("PeaceHealth and ApolloMD also share a commitment to maintaining **well-staffed** departments, emphasizing that competitive **compensation** is essential to attracting and retaining high-quality clinicians." (Emphasis added.)). Again, this violates the statute's prohibition on MSOs "[h]iring or terminating, setting work schedules or compensation for, or otherwise specifying terms of employment of medical licensees." ORS 676.555(2)(a)(G)(i).

In some public explanations, Defendants have asserted that the front organization, LEP, would actually be the entity providing medical services (the "professional medical entity"). *Id*. at ¶ 13, Ex. 2. Defendants' contention is false and does not become any more truthful with repetition. Specifically, all of the evidence, and common sense, demonstrates that LEP is simply made up by Defendants in an effort to feign compliance with ORS 676.555, and ApolloMD retains de facto control over LEP and its nominal owner, Dr. Johne Chapman.

For example,

1.      LEP did not exist when PeaceHealth awarded ApolloMD the contract. Parrish Dec. ¶ 5, Ex. 5; Anderson Dec. ¶ 17.

2.      LEP was not owned or organized by a physician licensed to practice medicine in Oregon when PeaceHealth awarded ApolloMD the contract. Parrish Dec. ¶ 6, Ex. 6; Anderson Dec. ¶ 17.

3.      LEP's purported sole owner, operator, manager and every officer is a physician who lives and works in Illinois. Parrish Dec. ¶ 5, Ex. 5; Anderson Dec. at ¶ 14, Ex. 4.

4.      LEP has not advertised to hire any physicians to replace the 41 EEP physicians who will no longer be providing services at the PeaceHealth facilities in a matter of months. Anderson Dec. at ¶ 19.

5.      All of PeaceHealth's public statements emphasize the purported experience and abilities of ApolloMD, not LEP. *Id*. at ¶ 13, Exs. 2-3.

Defendants' assertion that LEP (which they admit is nothing more than Dr. Chapman, an ApolloMD physician practicing in Illinois that they managed to get licensed in Oregon after ApolloMD was awarded the contract) is somehow autonomous from ApolloMD is pure fiction. For instance, when the audience is right, ApolloMD explains:

> "At ApolloMD, [Dr. Chapman] has found a place where his values align with his vocation, and where his passion for medicine continues to inspire those around him.  For physicians seeking to join a team where compassionate care and clinical excellence are not just goals but daily practices, Dr. Chapman's story serves as a powerful example of what's possible at ApolloMD. Here, you won't just find a job—you'll find a calling."

Parrish Dec. ¶ 2, Ex. 1.  Further, as noted above, Dr. Chapman was ApolloMD's Medical Director of the Year and appears to have practiced in multiple ApolloMD facilities.  *Id.*

On the contrary, when making representations to the Oregon Legislature and Governor, Defendants tell a different story, in which they suggest that Dr. Chapman is independent of ApolloMD and, as the sole member, manager and every single officer of the front LEP, will be "independent."  For instance, they explain, "Dr. Chapman receives no compensation or other remuneration from ABS or any ApolloMD affiliate, or any MSO owned or affiliated with ApolloMD."  Anderson Dec. at ¶ 14, Ex. 4.  And "as the sole owner and member [of LEP], Dr. Chapman will also serve as the sole manager and hold all officer positions for Lane.  This structure ensures direct physician control over all governance matters. Only Dr. Chapman, as sole member, may transfer ownership interests or appoint/remove managers/officers.  ApolloMD and its affiliates have no role whatsoever in Lane's governance, ownership decisions, or officer appointments." *Id.*

Notwithstanding the different accounts of who is doing what offered by Defendants to date, the fact that ApolloMD MSO and/or ApolloMD are exercising actual or at least de facto control over this activity is undeniable and in violation of Oregon law.  As described below, a preliminary injunction, preserving the status quo and barring Defendants from continuing to violate Oregon laws is necessary to protect Plaintiffs' rights during the pendency of the litigation.

3.    **Plaintiffs will suffer irreparable harm if Defendants' illegal conduct is not enjoined during the pendency of litigation.**

Absent a preliminary injunction, and as described in numerous declarations filed in support of this motion, Plaintiffs will suffer irreparable harm because patients will experience dangerously degraded quality of care, and because doctors will need to permanently move to find new work. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The Ninth Circuit Court of Appeals has held that "delayed and/or complete lack of necessary [medical] treatment, and increased pain and medical complications" constitutes irreparable harm. *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004). Here, Plaintiffs and the community will be irreparably harmed by the absence of adequate emergency care. Anderson Dec. at ¶¶ 2-12, 20; Orton Dec. at ¶¶ 2-7; Sabah Dec. at ¶¶ 2-6; Hunter Dec. at ¶¶ 2-7; Beardsley Dec. at ¶¶ 2-7; Rompala Dec. ¶¶ 2-10; Fantozzi Dec. ¶¶ 2-9; Deedon Dec. at ¶¶ 2-8.

Specifically, as the Declarations of Drs. Anderson, Orton, Sabah, Hunter, and Beardsley and Mr. Rompala (RN/BSN), Ms. Fantozzi (RN/BSN), and Mr. Deedon reflect, and as the testimony at the hearing will further confirm, there can be no legitimate dispute of the fact that patient care will be degraded and patients, including Jane, will be harmed if the status quo is not maintained until the Court has the opportunity for a hearing on the merits. That is true both because (1) Defendants' refusal to follow Oregon laws prohibiting the corporate practice of medicine will negatively affect patient care and (2) even if their "friendly physician model" were legal, Defendants cannot possibly safely transition to an entirely new team of emergency care providers by May 2026. *Id*.

For example, vetting, hiring, licensing and credentialling qualified emergency physicians takes significant time, with licensing and credentialling alone requiring three months. Anderson

Dec. at ¶¶ 2-3.  EEP has 41 qualified, licensed and credentialled emergency physicians working in the PeaceHealth Hospitals.  *Id*. at ¶ 18.  <u>ApolloMD currently has zero</u> (Dr. Chapman, from Illinois, appears to have been recently licensed in Oregon but not credentialled).  *Id*. at ¶ 19. And that is not likely to materially change anytime soon.  For example, over the last decade, no more than six emergency physicians have been successfully recruited to work at PeaceHealth Hospitals in any one year.  *Id*. at ¶ 10.  If action is not taken immediately, not only will Defendants have no likelihood of adequately staffing emergency rooms with full-time resident physicians, but those who are currently here have, and will continue to, make plans to leave, which will further harm Plaintiffs.  *Id*. at ¶ 22.

In sum, Defendants' unlawful conduct has and will also continue to harm Plaintiffs by creating unfair and illegal competition, including the attempted unlawful employment of medical physicians, and compromising the quality of emergency care available.  *See* Anderson Dec. at  ¶¶ 2-12, 20; Orton Dec. at ¶¶ 2-7; Sabah Dec. at ¶¶ 2-6; Hunter Dec. at ¶¶ 2-7; Beardsley Dec. at ¶¶ 2-7; Rompala Dec. ¶¶ 2-10; Fantozzi Dec. ¶¶ 2-9; Deedon Dec. at ¶¶ 2-8.

### 4.	**The balance of hardships tips sharply in Plaintiffs' favor.**

Here, the preliminary relief sought by Plaintiffs will not cause harm to Defendants. Specifically, PeaceHealth is free to end its relationship with EEP and transition to another professional medical entity, provided it does so legally and in a manner that does not jeopardize patients' (including Jane's) health.  Because Defendants are obligated to operate legally and to maintain a reasonable level of patient care, a preliminary injunction ensuring that they do so, and preserving the status quo until such time as they demonstrate both, is no meaningful imposition on them.  Similarly, Defendants cannot be harmed by being required simply to follow the law. Consequently, in weighing the relative hardships, the scale tips sharply in favor of Plaintiffs.

5.　　**The public interest supports issuance of a preliminary injunction.**

The final aspect of the preliminary injunction analysis involves weighing the public interest in maintaining the status quo. The attached declarations and testimony affirm the fact that maintaining the public's access to emergency healthcare is in the public's best interests. Anderson Dec. at ¶¶ 2-12, 20; Orton Dec. at ¶¶ 2-7; Sabah Dec. at ¶¶ 2-6; Hunter Dec. at ¶¶ 2-7; Rompala Dec. ¶¶ 2-10; Fantozzi Dec. ¶¶ 2-9; Deedon Dec. at ¶¶ 2-8. The declarations in support of Plaintiff's Motion for Preliminary Injunction and related testimony at the hearing (if allowed by the Court) will provide the Court with unwavering evidence, from both physicians and others involved in the delivery of health care services in Lane County, that maintaining the status quo until trial or such time that Defendants demonstrate they are complying with Oregon law and not putting the public in jeopardy is necessary. On the contrary, the evidence and testimony will also demonstrate that if a preliminary injunction is not issued, the public and Plaintiffs will be irreparably harmed or at significant risk of irreparable harm.

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

IV.     **Conclusion.**

For the reasons stated above, Plaintiffs respectfully request that the Court issue the proposed preliminary injunction order filed contemporaneously with this motion.

DATED: April 8, 2026.

HERSHNER HUNTER, LLP

By  */s/ Todd R. Johnston*
Todd R. Johnston (he/him), OSB 992913
tjohnston@hershnerhunter.com
Alexandra P. Hilsher (she/her), OSB 114218
ahilsher@hershnerhunter.com

Hayden K. Rooke-Ley (he/him), OSB 242890*
hayden.k.rookeley@gmail.com
*Application for admission forthcoming*

Brendan Ballou (he/him), DC Bar No. 241592*
brendan@publicintegrityproject.com
*Pro hac vice application forthcoming*

Of Attorneys for Plaintiffs