MISHA ISAAK, Bar No. 086430
misha.isaak@stoel.com
KEVIN R. SCHOCK, Bar No. 181889
kevin.schock@stoel.com
KATHARINE S. SHEPHERD, Bar No. 224891
kate.shepherd@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

*Attorneys for Defendant PeaceHealth*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON, EUGENE DIVISION

| | |
|---|---|
| KAREN STAPLETON, as guardian *ad litem* for JANE STAPLETON; DAN McGEE, MD, PhD, an individual and licensed medical practitioner; and EUGENE EMERGENCY PHYSICIANS, P.C., an Oregon professional corporation, <br><br> Plaintiffs, <br><br> v. <br><br> PEACEHEALTH, a Washington nonprofit corporation; APOLLOMD, INC., a Georgia corporation; APOLLOMD BUSINESS SERVICES, LLC; LANE EMERGENCY PHYSICIANS LLC, an Oregon limited liability corporation; and DOES 1-5, <br><br> Defendants. | Case No.:  6:26-cv-00684-MTK <br><br> **DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................... 1

II. FACTUAL BACKGROUND ........................................................................ 2

    A.    PeaceHealth's commitment to high-quality emergency care in Lane County ........................................................................................................ 2

    B.    PeaceHealth's decision to conduct a competitive RFP process ............................ 3

    C.    PeaceHealth's rigorous, neutral, and patient-focused evaluation process. ............ 4

    D.    PeaceHealth and Apollo Defendants' transition planning ensures continuity of care. ...................................................................................... 5

    E.    Plaintiffs' lawsuit and Oregon's Corporate Practice of Medicine law. ................. 6

III. LEGAL STANDARD .................................................................................. 8

IV. ARGUMENT ............................................................................................... 9

    A.    Plaintiffs ask the Court to apply the wrong legal standard. ................................. 9

    B.    Plaintiffs do not show that they are likely to succeed on the merits of their claim, let alone that the law and facts "clearly favor" their position. ................... 11

        1.    Plaintiffs lack standing to maintain their claims. .................................... 11

            a.    Plaintiffs fail to allege a legally cognizable injury that is traceable to the complained-of conduct. ..................................... 11

                (i)    The outcome of a competitive bidding process and the subsequent nonrenewal of EEP's contract are not sufficient injuries to confer Article III standing. ....... 12

                (ii)    Plaintiffs offer no evidence of an Article III injury sufficient to confer standing on Dr. McGee, Karen Stapleton, or J.S. ............................................................. 13

           b.    A favorable decision will not redress Plaintiffs' alleged harm. ................................................................................... 14

        2.    Plaintiffs cannot succeed on their claim under ORS 676.555. ................. 15

           a.    Plaintiffs lack a private right of action under the relevant statute. ..................................................................................... 15

           b.    Plaintiffs offer no evidence that Defendants have violated or will violate ORS 676.555. ...................................................... 18

    C.    Plaintiffs cannot show irreparable harm. ........................................................... 20

        1.    Plaintiffs have an adequate remedy at law. ............................................. 21

        2.    Plaintiffs' own conduct belies the existence of irreparable harm ............ 22

**TABLE OF CONTENTS**
(continued)

**Page**

3.  Plaintiffs' declarations do not establish irreparable harm........................ 24

    a.  The Hunter, Sabah, and Beardsley declarations. ......................... 25

    b.  The Orton declaration .................................................................. 25

    c.  The Fantozzi and Rompala declarations. .................................... 26

    d.  The Anderson declaration. ........................................................... 27

    e.  The Deedon declaration. .............................................................. 28

    f.  The Stapleton declaration. ........................................................... 29

D.  The balance of the equities weighs decisively against a preliminary injunction. ................................................................................................... 30

E.  The public interest favors denial of injunctive relief. ......................................... 32

F.  A provisional remedy, if determined to be necessary, should be narrowly tailored and should not compel a provider relationship....................................... 33

V. CONCLUSION ................................................................................................................ 37

## TABLE OF AUTHORITIES

**Page**

**Cases**

*A. H. R. v. Wash. State Health Care Auth.*,
469 F. Supp. 3d 1018 (W.D. Wash. 2016)................................................................35

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................10

*Am. C.L. Union of Nev. v. Lomax*,
471 F.3d 1010 (9th Cir. 2006) ................................................................15

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ................................................................8

*Bay River, Inc. v. Env't Quality Comm'n*,
26 Or. App. 717 (1976)................................................................17

*Bellikka v. Green*,
306 Or. 630 (1988)................................................................18

*Bennett v. Isagenix Int'l LLC*,
118 F.4th 1120 (9th Cir. 2024) ................................................................24

*Bonnichsen v. United States*,
367 F.3d 864 (9th Cir. 2004) ................................................................14

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ................................................................20, 28

*Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*,
963 F. Supp. 1083 (D. Utah 1997)................................................................26

*City & County of San Francisco v. Barr*,
965 F.3d 753 (9th Cir. 2020) ................................................................34

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)................................................................13, 14

*Colorado River Indian Tribes v. Town of Parker*,
776 F.2d 846 (9th Cir. 1985) ................................................................25

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ................................................................9, 10

# TABLE OF AUTHORITIES
(continued)

**Page**

*E.J.T. v. Jefferson County*,
No. 3:20 CV 01990 MO, 2023 WL 6174380 (D. Or. Sept. 22, 2023), *reversed and remanded in part on other grounds*, 2025 WL 2986113 (9th Cir. Oct. 23, 2025) ...............................................................................................................17

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ...................................................................................8

*Env't Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020) ................................................................................11

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ..................................................................9

*Golden State Transit Corp. v. City of Los Angeles*,
686 F.2d 758 (9th Cir. 1982) ................................................................................12

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024), *as amended* (June 14, 2024), *cert. granted*, 145 S. Ct. 2871 (2025)...........................................................................................33

*Hennessy-Waller v. Snyder*,
529 F. Supp. 3d 1031 (D. Ariz. 2021) ..................................................................34

*Henry v. Gerber Prod. Co.*,
No. 3:15-cv-02201-HZ, 2016 WL 1589900 (D. Or. Apr. 18, 2016) ......................17

*Idaho Anti-Trafficking Coal. v. Somerton*,
No. 1:24-CV-00526-REP, 2025 WL 673928 (D. Idaho Mar. 3, 2025) .................10

*Immigrant Legal Res. Ctr. v. City of McFarland*,
827 F. App'x 749 (9th Cir. 2020) ....................................................................20, 24

*J. Conrad LTD v. United States*,
457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) .......................................................29

*Jeffrey v. St. Clair*,
933 F. Supp. 963 (D. Haw. 1996)..........................................................................34

*Johnson v. Brown*,
567 F. Supp. 3d 1230 (D. Or. 2021) .....................................................................28

*Ken Leahy Const., Inc. v. Cascade Gen., Inc.*,
329 Or. 566 (1999)................................................................................................17

## TABLE OF AUTHORITIES
(continued)

**Page**

*Koller v. Brown*,
224 F. Supp. 3d 871 (N.D. Cal. 2016) ...................................................................25

*LA All. for Hum. Rts. v. County of Los Angeles*,
14 F.4th 947 (9th Cir. 2021) ...............................................................................11

*Look v. United States*,
113 F.3d 1129 (9th Cir. 1997) ............................................................................12

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ..............................................................................8

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) ..............................................................................11

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
638 F.3d 644 (9th Cir. 2011) ..............................................................................34

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980) .......................................................................21, 30

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................11, 12, 14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ..............................................................................24

*Nearing v. Weaver*,
295 Or. 702 (1983)...............................................................................................16

*Nevada v. United States*,
364 F. Supp. 3d 1149 (D. Nev. 2019)...................................................................20

*Or. Nat. Desert Ass'n v. Kimbell*,
No. CIV. 07-1871-SU, 2008 WL 4186913 (D. Or. Sept. 5, 2008), *vacated in part on other grounds*, 2009 WL 1663037 (D. Or. June 15, 2009).......................19

*Or. Nat'l Desert Ass'n v. Bushue*,
594 F. Supp. 3d 1259 (D. Or. 2022) ....................................................................23

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) ............................................................................34

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
636 F.3d 1150 (9th Cir. 2011) ..............................................................................9

# TABLE OF AUTHORITIES
(continued)

**Page**

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ......................................................................................21

*Romero Rebolledo v. Chestnut*,
No. 1:25-CV-01904-WBS-CKD, 2025 WL 3683122 (E.D. Cal. Dec. 18,
2025) .............................................................................................................................10

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ....................................................................................12

*Savage v. Elevenate, INC.*,
No. 3:26-CV-00302-AB, 2026 WL 788937 (D. Or. Mar. 20, 2026).........................22

*Serles v. Beneficial Or., Inc.*,
91 Or. App. 697 (1988)................................................................................................16

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
131 F.4th 102 (2d Cir. 2025) ......................................................................................27

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) ......................................................................................20

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024).....................................................................................................10

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ...............................................................................30, 32

*Todd v. Chase Manhattan Mortg. Corp.*,
No. CV 12-00129-PHX-FJM, 2012 WL 1906505 (D. Ariz. May 25, 2012)............21

*Tucson v. City of Seattle*,
91 F.4th 1318 (9th Cir. 2024) ...............................................................................14, 15

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,
Inc.*,
454 U.S. 464 (1982)......................................................................................................15

*Wash. Env't Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) ....................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)................................................................................................ passim

# TABLE OF AUTHORITIES
(continued)

**Page**

**Statutes**

Oregon Declaratory Judgment Act, ORS 28.010 *et seq.* ........................................................17

ORS 415.500, *et seq.*..................................................................................................................17

ORS 676.555............................................................................................................................ passim

ORS 676.555(2)(a)........................................................................................................................16

ORS 676.555(2)(a)(G) ..........................................................................................................6, 7, 19

ORS 676.555(5)(b) ......................................................................................................................16

ORS 676.555(5)(b)(C) ................................................................................................................17

**Rules**

LR 7-2(b) .....................................................................................................................................38

**Regulations**

OAR 409-070-0000 - OAR 409-070-0085 ..................................................................................17

**Constitutional Provisions**

U.S. Const. art. III................................................................................................................12, 13, 14

**Other Authorities**

Oregon Medical Board License Verification Website
 https://omb.oregon.gov/Clients/ORMB/Public/VerificationDetails.aspx?Entity
 ID=1598774 ...........................................................................................................................7

Or. Legis. Assemb., H. Comm. on Behav. Health & Health Care, Staff Measure
 Summary, S.B. 951-A, 83d Leg. Assemb., Reg. Sess. (Or. 2025) ............................................6

11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2026 ed.)............................21, 23

Defendant PeaceHealth ("PeaceHealth") submits the following response in opposition to the Motion for Preliminary Injunction by plaintiffs Karen Stapleton, as guardian *ad litem* for Jane Stapleton; Dan McGee, MD, PhD; and Eugene Emergency Physicians, P.C. (collectively, "Plaintiffs"). PeaceHealth's response is supported by the following memorandum, the record and pleadings on file in this action, and the supporting Declarations of Dr. Kimberly Ruscher ("Ruscher Decl."), Denise Dismuke-Gideon ("Gideon Decl."), and Vinutha Mattigod ("Mattigod Decl.").

## I.  INTRODUCTION

Plaintiffs ask for an extraordinary injunction that would upend a lawful, months-long planning process undertaken by a nonprofit hospital system to ensure uninterrupted emergency care for communities throughout Lane County. But the request for this extraordinary provisional remedy rests on speculation, mischaracterization of the record, and a fundamental inversion of the equities. PeaceHealth did not create a crisis here. It identified, well in advance, the upcoming expiration of the contract of an emergency medicine physician group and conducted a fair and rigorous competitive process to select a provider best equipped to deliver high quality emergency care. PeaceHealth and Defendants ApolloMD, Inc. ("ApolloMD"), ApolloMD Business Services, LLC, and Lane Emergency Physicians ("Lane") (collectively, the "Apollo Defendants") have been working methodically to ensure a seamless transition for patients. The real risk of disruption arises from Plaintiffs' demand that the Court freeze this process on the eve of implementation.

The record demonstrates that PeaceHealth acted responsibly and transparently throughout this process. Facing contracts set to expire in mid-2026, PeaceHealth initiated a neutral request for proposals ("RFP") process that was designed around priorities of patient safety, staffing sufficiency, quality improvement, and transition readiness. Plaintiff Eugene Emergency

Physicians ("EEP") participated fully in that process but, among four bidders, it scored last—including on criteria closely tied to patient care. PeaceHealth selected ApolloMD, which immediately began detailed transition planning to avoid interruption in emergency services. Those efforts are ongoing, concrete, and well advanced. Plaintiffs' attempt to recast this careful planning as unlawful or dangerous ignores the record and operational realities of emergency medicine.

A preliminary injunction would not preserve the status quo—it would destabilize it. Granting Plaintiffs' request would halt active transition planning, inject profound uncertainty into emergency department staffing, and jeopardize PeaceHealth's ability to meet its obligation to ensure continuous emergency services for the public. Plaintiffs, by contrast, identify no concrete, nonspeculative harm that will occur absent an injunction. Their true grievance is not patient harm, but dissatisfaction with the outcome of a competitive RFP process and the impending expiration of their contract. That is not a basis for emergency equitable relief, particularly where the public interest in uninterrupted emergency care weighs decisively against judicial intervention.

Because Plaintiffs cannot show a likelihood of success on the merits nor demonstrate irreparable harm, and because they seek relief that would affirmatively risk harm to patients and the community, their motion for a preliminary injunction should be denied.

## II.  FACTUAL BACKGROUND

**A.  PeaceHealth's commitment to high-quality emergency care in Lane County.**

PeaceHealth is a nonprofit health system that serves patients throughout Lane County and the surrounding region, including at PeaceHealth Sacred Heart Medical Center RiverBend ("RiverBend"), PeaceHealth Cottage Grove Community Medical Center ("Cottage Grove"), and PeaceHealth PeaceHarbor Medical Center in Florence, Oregon ("PeaceHarbor"). Ruscher Decl. ¶ 2. PeaceHealth is committed to ensuring that the communities it serves have continuous access

Page 2 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

to safe, high-quality, patient-centered emergency medical services. *Id.* ¶ 4. That commitment is embedded in PeaceHealth's contracts with provider groups and guides its regular evaluation of clinical services across its hospitals. *Id.* ¶¶ 4, 7.

For more than three decades, EEP provided emergency physician services at certain PeaceHealth facilities in Oregon. *See id.* ¶ 5. PeaceHealth holds those physicians in high regard and acknowledges their years of service to the community. *Id.* ¶ 6. But as emergency medicine, quality benchmarking, workforce challenges, and regulatory requirements have evolved, PeaceHealth—like health systems across the country—has a responsibility to periodically reassess how best to deliver emergency care to meet current and future community needs. *See id.* ¶ 7.

**B.      PeaceHealth's decision to conduct a competitive RFP process.**

EEP's existing contracts with PeaceHealth were set to expire by their own terms in mid-2026. *Id.* ¶ 5; Mattigod Decl. ¶ 5; *see also* Mattigod Decl. Ex. 1. In fall 2025, PeaceHealth's Physician Contracting Committee reviewed those upcoming expirations alongside broader operational considerations, which included changing community demand and the closure of another regional hospital. Gideon Decl. ¶¶ 6, 8. To ensure PeaceHealth had a full and informed understanding of the available options for emergency medicine services at Cottage Grove, PeaceHarbor, and RiverBend, the Committee determined that a competitive RFP process was appropriate. *Id.* ¶ 8; *see also* Gideon Decl. Ex. 1. In December 2025, PeaceHealth sent a notice of nonrenewal to EEP reflecting that (subject to the ongoing RFP process) it did not intend to renew EEP's contract after expiration. *See* Mattigod Decl. ¶ 7; Mattigod Decl. Exs. 2–4.

The RFP process was designed and administered centrally by PeaceHealth's system leadership to promote transparency, fairness, objectivity, and, importantly, compliance with Oregon's recently enacted Corporate Practice of Medicine law, commonly referred to as "S.B.

951." *See* Gideon Decl. ¶¶ 14, 16. PeaceHealth identified multiple potential provider groups based on prior experience, internal referrals, and independent research, including EEP as the incumbent provider. *Id.* ¶ 12. All participants were required to execute nondisclosure agreements, received identical RFP materials, and were given the same opportunity to submit questions and present their proposals. *Id.* ¶¶ 13, 15, 19. Crucially, PeaceHealth put compliance with S.B. 951, codified as ORS 676.555 *et seq.*, at the forefront of the RFP process by requiring each potential RFP participant to certify that they would be able to comply with that law. *Id.* ¶ 14; Ruscher Decl. ¶12. At least one potential candidate was unable to make that certification and therefore elected not to move forward with PeaceHealth's RFP process. Gideon Decl. ¶ 14. Both ApolloMD and EEP were able to certify that they would be compliant with that law and accordingly were allowed to continue in the RFP process. *Id.*

**C.    PeaceHealth's rigorous, neutral, and patient-focused evaluation process.**

The RFP evaluation was conducted by a multi-disciplinary committee composed of clinical, operational, nursing, financial, and system leadership who would be directly responsible for working with the selected provider. *Id.* ¶ 18. The committee agreed in advance on objective evaluation criteria, including nine categories and forty-two sub-criteria. *Id.* ¶¶ 20; *see also* Gideon Decl. Ex. 2, Ex. 3. The criteria given the most substantial weight were those that were directly related to the quality of patient care and access to services: "Benchmarking, Analytics, Quality Improvement," "Recruitment and Transition Plan," and "Staffing Matrix, Call Coverage." Gideon Decl. ¶ 21. Together, these three criteria topics represented more than 50% of the total available criteria weight. *Id.*

EEP participated fully in the RFP process alongside three other organizations. Ruscher Decl. ¶ 8. All communications with bidders were routed through designated PeaceHealth

Page 4 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

administrators to ensure no participant received preferential access or influence. Gideon Decl. ¶ 16; *see also* Gideon Decl. Ex. 1 at 11–12. The PeaceHealth evaluators scored each of the proposals independently before sending those scores via "blind ballot" to a neutral administrator for tabulation. Ruscher Decl. ¶ 9; Mattigod Decl. ¶ 11; *see also* Gideon Decl. Ex. 4. The PeaceHealth evaluators did not discuss with each other substantive views about the bidders and proposals until after scoring was complete. Ruscher Decl. ¶ 9; Mattigod Decl. ¶ 11.

After tabulation, ApolloMD received the highest overall score across the group, including the highest scores on the most heavily weighted patient-care criteria. Gideon Decl. ¶ 24–25; Mattigod Decl. ¶ 13; Gideon Decl. Ex. 4. EEP received the lowest combined score of the four participants. Gideon Decl. ¶ 24–26; Mattigod Decl. ¶ 13; Gideon Decl. Ex. 4. Based on those objective results, PeaceHealth's leadership accepted the committee's recommendation and selected ApolloMD as its future emergency medicine partner at Cottage Grove, PeaceHarbor, and RiverBend. PeaceHealth notified all RFP participants, including EEP, of the outcome in February 2026. Gideon Decl. ¶ 30–31; Gideon Decl. Exs. 5, 6.

**D.    PeaceHealth and Apollo Defendants' transition planning ensures continuity of care.**

Following execution of a letter of intent, ApolloMD immediately began detailed transition planning with Lane, together with PeaceHealth, to ensure uninterrupted emergency services when EEP's contracts expire in mid-2026. Ruscher Decl. ¶¶ 14–16. These efforts have focused on physician staffing, credentialing, training, and operational readiness, with the goal of providing seamless, high-quality emergency care from day one of the transition. *Id.* ¶ 15; Gideon Decl. ¶ 32. ApolloMD and Lane are actively engaging with PeaceHealth in the transition-planning process, including by having a regular onsite presence at PeaceHealth hospitals and frequent status updates regarding recruitment and preparedness. Ruscher Decl. ¶ 16; Gideon Decl. ¶ 33. Based on this

Page 5 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

work, PeaceHealth is confident that all three emergency departments will be fully staffed and operational on the applicable transition dates. Ruscher Decl. ¶ 22; Gideon Decl. ¶¶ 32–33.

PeaceHealth also invited EEP to participate in transition planning to support continuity of patient care. Ruscher Decl. ¶ 17. Despite multiple requests to EEP's leadership, EEP declined to engage in those discussions. *Id.* ¶¶ 17–19; Ruscher Decl. Ex. 1. EEP's refusal to participate in good faith in transition planning has complicated—but not derailed—efforts to ensure a smooth transition focused on patient care. *See* Ruscher Decl. ¶¶ 21–22.

**E.      Plaintiffs' lawsuit and Oregon's Corporate Practice of Medicine law.**

Rather than participating in transition planning, Plaintiffs filed this lawsuit seeking to enjoin PeaceHealth from allowing its contract with EEP to expire and to block the implementation of the RFP outcome. Plaintiffs allege that PeaceHealth's selection of a different emergency medicine partner violates Oregon's Corporate Practice of Medicine ("CPM") law, ORS 676.555 *et seq.* (often called "S.B. 951"), and will disrupt care.

The CPM statute is a patient-protection measure enacted in 2025 to address the concern that "allowing non-physicians to make decisions about health care delivery could increase care costs, result in lower quality care for patients, and create ethical dilemmas for physicians." Or. Legis. Assemb., H. Comm. on Behav. Health & Health Care, Staff Measure Summary, S.B. 951-A, 83d Leg. Assemb., Reg. Sess. (Or. 2025), at p. 2. The CPM statute prohibits, *inter alia*, private companies from exercising de facto control over a physician-owned medical practice in a way that affects clinical decision making. ORS 676.555(2)(a)(G). The statute lists clinical functions over which "ultimate decision-making authority" is reserved for the physician-owned practice, including setting clinical staffing levels; making diagnostic coding decisions; and setting clinical

Page 6 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

standards or policies. *Id.* Relevant legislative history is detailed in PeaceHealth's motion to dismiss.

EEP does not allege that Defendants are currently exercising "de facto" control over clinical decision-making or exercising "ultimate decision-making authority" over any clinical function. Instead, EEP argues that the CPM statute is implicated because PeaceHealth's future emergency medical services provider might adopt a "business model" that allegedly violates the statute. Compl., ¶¶ 23, 25. Despite that EEP has virtually no information about the structure and planning being put in place to staff the Emergency Departments of Riverbend, Cottage Grove, and PeaceHarbor, EEP speculates that Lane might permit one of the Apollo Defendants, which provide management services organization ("MSO") services, to influence clinical decision-making by advertising Lane's services under another entity's name, Compl., ¶¶ 26–27, negotiating contracts with third-party payors on Lane's behalf, Compl., ¶ 28, or setting billing and collection policies, Compl., ¶ 29. Plaintiffs further allege that Defendants ApolloMD, Inc. and ApolloMD Business Services, LLC—the alleged MSOs—might exercise "de facto control" over Lane's clinical operations—but the Complaint offers no detail explaining how such control would occur or what clinical decisions would allegedly be affected. Compl., ¶ 30. These speculative allegations concerning Lane's hypothetical future conduct are not based on the personal knowledge of any Plaintiff—or anyone else. Yet, they form the entire basis of EEP's claims in this case.[1]

To be clear, EEP does not allege that there is anything inherently unlawful about the business structure of the Apollo entities and Lane. Despite sinister tones and suggestions of

---

[1] EEP also alleges that Lane is an "illegal entity" because its owner-manager, Dr. Johne Philip Chapman, is allegedly not "a licensed physician in the state of Oregon." Compl., ¶¶ 13, 24. This allegation, however, is untrue. Dr. Chapman is an Oregon-licensed physician holding medical license number MD229326. *See* https://omb.oregon.gov/Clients/ORMB/Public/VerificationDetails.aspx?EntityID=1598774.

Page 7 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

impropriety embedded in EEP's narrative, EEP never says that the CPM law prohibits management service organizations from providing administrative functions in emergency departments or from partnering with physician-owned and -run physicians groups. Even the so-called "Friendly Physician" model that EEP decries is never alleged to be unlawful. Those omissions are themselves an admission: ***there is nothing inherently unlawful about the business structure of the Apollo entities and Lane***. EEP's claims rest entirely on speculation about things it assumes Apollo and Lane may do, in the future, that EEP says will violate the CPM law.

### III.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Indeed, "plaintiffs seeking a preliminary injunction face a difficult task in proving that they are entitled to this 'extraordinary remedy.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 22); *see also Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) ("A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (quotation marks omitted, emphasis in original)).

"The appropriate legal standard to analyze a preliminary injunction motion requires a district court to determine whether a movant has established that (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter*, 555 U.S. at 20).  "As a general matter, district courts '*must* consider' all four *Winter* factors." *Id.* (citation omitted, emphasis in original)).

Where, as here, the movant seeks a mandatory injunction, its burden "is doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). In this case, Plaintiffs "must establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Id.* (emphasis in original). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022); *see also Garcia*, 786 F.3d at 740 ("In plain terms, mandatory injunctions should not issue in 'doubtful cases.'" (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

## IV.  ARGUMENT

### A.    Plaintiffs ask the Court to apply the wrong legal standard.

Plaintiffs argue in their motion that they seek a preliminary injunction "maintaining the status quo," in other words, a prohibitive injunction. *See, e.g.*, Pls.' Mot. (ECF 5) at 12. As the record demonstrates, however, the services contracts between EEP and PeaceHealth were set to expire in the normal course in mid-2026. Accordingly, returning to the pre-February 2026 "status quo" would mean that EEP is essentially in the exact same position as it is now, with its contractual relationships with PeaceHealth set to expire.

What Plaintiffs actually seek is an order requiring PeaceHealth to affirmatively extend the contractual relationship with EEP pending resolution of this case (if not longer). Plaintiffs' request is properly considered a request for a mandatory injunction. *Snyder, 28 F.4th at 111* (explaining that a mandatory injunction is "one that goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits.").

Plaintiffs also suggest that the Court may apply the "serious questions" test in evaluating their request for preliminary injunctive relief. "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). But recent U.S. Supreme Court guidance casts great doubt on the continuing viability of the "sliding scale" approach. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (holding that, "absent a clear command from Congress, courts must adhere to the traditional four-factor test" for granting a preliminary injunction articulated in *Winter*).

But the Court does not have to decide whether the "serious questions" test remains generally applicable to preliminary injunctions, because "[g]iven the greater showing required for mandatory injunctions, courts have declined to apply the 'serious questions' sliding scale inquiry to that type of requested injunctive relief." *Idaho Anti-Trafficking Coal. v. Somerton*, No. 1:24-CV-00526-REP, 2025 WL 673928, at *4 (D. Idaho Mar. 3, 2025); *Snyder*, 28 F.4th at 111, n.4 (for mandatory injunctions, "weakness in a plaintiff's showing of harm cannot be offset by a stronger showing on the merits of the underlying legal claim") (internal citation omitted); *see also Romero Rebolledo v. Chestnut*, No. 1:25-CV-01904-WBS-CKD, 2025 WL 3683122, at *2 (E.D. Cal. Dec. 18, 2025) ("even assuming that the so-called 'serious questions' test remains viable after *Winter* and *Starbuck*s, it nevertheless is inapplicable here, where petitioner is seeking a mandatory injunction"). Accordingly, because Plaintiffs seek a mandatory injunction, the Court should apply the "doubly demanding" standard applicable to such relief and should not permit Plaintiffs to offset their weaknesses under the *Winter* analysis.

**B.      Plaintiffs do not show that they are likely to succeed on the merits of their claim, let alone that the law and facts "clearly favor" their position.**

On a motion for preliminary injunction, the merits inquiry "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). Plaintiffs fail to meet their burden to show a likelihood of success on the merits of their claim— let alone that the law and facts "clearly favor" their position—for two reasons. First, Plaintiffs lack standing to bring their claims in the first instance. Second, Plaintiffs fail to demonstrate that PeaceHealth or any other defendant has violated Oregon's CPM law.

**1.      Plaintiffs lack standing to maintain their claims.**

"In order to invoke the jurisdiction of the federal courts, a plaintiff must establish 'the irreducible constitutional minimum of standing,' consisting of three elements: injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "At the preliminary injunction stage, the plaintiffs must make a clear showing of each element of standing, relying on the allegations in their complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden." *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956–57 (9th Cir. 2021) (cleaned up). Here, Plaintiffs lack standing because they fail to allege a legally cognizable injury that is traceable to the complained-of conduct, and because they do not demonstrate that a favorable decision will redress the alleged injury.

**a.      Plaintiffs fail to allege a legally cognizable injury that is traceable to the complained-of conduct.**

In order to have standing, Plaintiffs must have "suffered an 'injury in fact'—i.e., an invasion of a legally protected interest that is concrete and particularized, as well as actual or

imminent as opposed to conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560–61. Neither the Complaint nor Plaintiffs' motion for preliminary injunction make clear what "legally protected interest" is or will be invaded by PeaceHealth's decision to contract with ApolloMD to provide clinical and administrative services for the emergency departments at its Lane County hospitals.

> **(i)      The outcome of a competitive bidding process and the subsequent nonrenewal of EEP's contract are not sufficient injuries to confer Article III standing.**

The true "injury" animating this lawsuit appears to be the loss of EEP's contract with PeaceHealth. This is insufficient to confer standing. EEP does not have a contractual right to have its PeaceHealth contract extended; the mere expiration or nonrenewal of a contract is not a cognizable injury sufficient to confer Article III standing. *See Golden State Transit Corp. v. City of Los Angeles*, 686 F.2d 758, 761 (9th Cir. 1982) (reversing grant of preliminary injunction and concluding that the plaintiff failed to make the merits showing on procedural due process claim because there is "no constitutionally protected property interest in a franchise renewal" and "[a]t most, Yellow Cab had only a unilateral hope for renewal"). Nor is there a cognizable injury flowing from the loss of the competitive bidding process. *See also Look v. United States*, 113 F.3d 1129, 1131–32 (9th Cir. 1997) (explaining that "[t]here could be no real injury—certainly no injury 'fairly traceable' to the allegedly illegal act—unless the plaintiff would have had some chance of prevailing in a bidding free of the alleged illegalities"). In sum, EEP's disappointment about contract nonrenewal and the outcome of a competitive bidding process simply is not an Article III injury sufficient to demonstrate standing for purposes of mandatory injunctive relief.

Apparently in recognition that it has a standing problem, EEP's complaint tries to substantiate its standing with allegations about the supposed "legally protected interests" at stake. But these allegations do not cure EEP's justiciability deficit. *See Safe Air for Everyone v. Meyer,*

373 F.3d 1035, 1039 (9th Cir. 2004) (explaining that on a factual challenge, allegations about jurisdiction are not presumed to be true). EEP alleges, for example, that it has "a legally protectible interest in the ability of its physicians to exercise medical judgment while practicing medicine without the inappropriate and unlawful interference of for-profit corporations." Compl., ¶ 1. But no such interest belongs to EEP.[2] EEP's theory of injury rests entirely on speculation about how PeaceHealth's next emergency medicine services provider might operate under a hypothetical future contract *after* EEP's contract expires. Compl., ¶¶ 26–30. Such conjectural allegations— unsupported by any concrete facts or allegations of imminent conduct—are insufficient to establish an actual or imminent invasion of a legally protected interest. At best, Plaintiffs' Complaint alleges a "hypothetical future harm that is not certainly impending," which is insufficient to support standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Moreover, nothing in the statute confers an independent, legally protectable right on a corporate entity such as EEP. Because there is no question presented in this case about the medical independence of EEP or its members, that cannot provide a legally protected interest that to establish standing in this case.

> **(ii)      Plaintiffs offer no evidence of an Article III injury sufficient to confer standing on Dr. McGee, Karen Stapleton, or J.S.**

Plaintiffs have also failed to establish that standing exists for Dan McGee, MD, PhD ("Dr. McGee"), Karen Stapleton, or J.S. Starting with Dr. McGee, as explained in PeaceHealth's concurrently filed motion to dismiss, the Complaint is devoid of factual allegations establishing Dr. McGee's standing.[3] Plaintiffs make no better showing at the preliminary injunction stage.

---

[2] Although the CPM statute is intended to safeguard the independent medical judgment of licensed physicians, that interest belongs to the Lane-affiliated physicians who will be practicing in PeaceHealth's Emergency Departments after the transition.

[3] Dr. McGee is mentioned just twice in the Complaint. *See* Compl., ¶¶ 2, 3. In paragraph 3 of the Complaint, Plaintiffs allege EEP has a legally protected interest "[l]ike [that of] Dr. McGee."

Page 13 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Indeed, Plaintiffs do not offer a declaration or *any other evidence* showing that Dr. McGee has suffered a concrete and particularized injury of the type that would allow him to maintain this action or justify the imposition of the extraordinary remedy of a preliminary injunction.

Plaintiffs' showing fares no better for Karen Stapleton or J.S. In the Complaint, Stapleton claims a generalized interest in "patient centered medical care" and alleges that her minor child received ER care sometime in the past and may need care in the future. Stapleton's declaration in support of the motion for preliminary injunction contains the same threadbare statements. *See* ECF 14. But neither the allegations nor the declaration provide any indication that Stapleton or J.S. has suffered concrete, particularized, actual or imminent injury. *See Clapper*, 568 U.S. at 409 ("We have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." (cleaned up)).

### b.    A favorable decision will not redress Plaintiffs' alleged harm.

Even assuming Plaintiffs could establish a legal violation, Article III requires that a favorable decision be likely to redress the alleged injury—not merely vindicate an abstract grievance. *See, e.g.*, *Lujan*, 504 U.S. at 560–61. "The question in deciding whether a plaintiff's injury is redressable is not whether a favorable decision is likely but whether a favorable decision likely will redress a plaintiff's injury." *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024) (quoting *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir. 2004)). "Therefore, 'redressability analyzes the connection between the alleged injury and requested judicial relief.'"

---

Although the Complaint asserts that Dr. McGee has a legally protected interest in exercising independent medical judgment, it alleges no facts showing that this interest has been—or will be—violated. It does not allege that any Defendant interfered with Dr. McGee's medical judgment, that he practices emergency medicine, that he works at PeaceHealth, or that PeaceHealth's contracting decisions affect him at all. It does not even allege that Dr. McGee is currently practicing medicine. These allegations are insufficient to establish standing.

*Id.* (quoting *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013)). "[R]edressability asks whether 'the district court had the power to prevent the injury at the time the complaint was filed.'" *Id.* (quoting *Am. C.L. Union of Nev. v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006)).

The redressability requirement is not met here. EEP's contracts with PeaceHealth are expiring by their own terms, and EEP has no legal entitlement to renewal or extension of those agreements. Nor does EEP provide a legal basis to compel PeaceHealth to contract with a specific provider. Compounding the redressability defect, EEP ranked fourth—***dead last***—in PeaceHealth's competitive RFP process. Accordingly, even if Plaintiffs were correct that Lane or ApolloMD were operating unlawfully (and they are not), any available remedy would not rectify EEP's alleged injury. At most, the Court could order those entities to cure any legal defect. Even if the Court could disqualify Lane and Apollo from contracting with PeaceHealth (and it is not clear what the legal basis for that would be), PeaceHealth would proceed to contract with the next highest-ranked bidder, not EEP. PeaceHealth could also employ physicians directly, as it does in the PeaceHarbor emergency department. Because Plaintiffs' requested relief would not likely result in EEP retaining or regaining the emergency department contract, the asserted injury cannot "fairly . . . be traced to the challenged action." *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Plaintiffs therefore lack standing to seek the relief they request.

### 2. Plaintiffs cannot succeed on their claim under ORS 676.555.

#### a. Plaintiffs lack a private right of action under the relevant statute.

As noted above, Plaintiffs' claims depend entirely on Oregon's CPM statute, ORS 676.555. But the statute's private right of action is narrow and expressed: a medical licensee or professional medical entity that suffers an ascertainable loss may sue a management services organization with

which it has a contract for management services for damages, an injunction, and equitable relief. That is not this case.

The CPM statute includes an expressed right of action for a defined class of plaintiffs:

> A medical licensee or professional medical entity that suffers an ascertainable loss of money or property as a result of a violation of a prohibition set forth in subsection (2)(a) of this section may bring an action against a management services organization with which the medical licensee or professional medical entity has a contract for management services, or a shareholder, director, member, manager, officer or employee of the management services organization … to obtain:
>
> (A) Actual damages equivalent to the medical licensee's or professional medical entity's loss;
>
> (B) An injunction against an act or practice that violates the prohibition; and
>
> (C) Other equitable relief the court deems appropriate.

ORS 676.555(5)(b). The statute is clear that only a plaintiff who is a "medical licensee or professional medical entity" who "has a contract" with "a management services organization" may bring an action against that MSO. The statute does not authorize civil actions against hospitals or against MSOs who have no contract with the plaintiff. It is beyond reasonable dispute that the private cause of action in the statute does not include the plaintiffs or claims in this case.

Under Oregon law, statutory liability exists only when the legislature has expressly or impliedly created a private right of action for the breach of a statutory duty. *Nearing v. Weaver*, 295 Or. 702, 707 (1983). Although Oregon courts sometimes infer a private cause of action where none exists, they do so only where a statute is silent on the matter and only where necessary to effectuate legislative intent. *Serles v. Beneficial Or., Inc.*, 91 Or. App. 697, 703 (1988). Those prerequisites simply are not present here. The statute plainly is not silent; it has an expressed cause

of action. That is the best evidence that the legislature did not intend to authorize the kind of claim asserted here.

Where the legislature has declined to create a right of action for a particular kind of plaintiff or case, courts will not supply it by judicial fiat. *See E.J.T. v. Jefferson County*, No. 3:20 CV 01990 MO, 2023 WL 6174380, at *1 (D. Or. Sept. 22, 2023) (rejecting implied private right of action), *reversed and remanded in part on other grounds*, 2025 WL 2986113 (9th Cir. Oct. 23, 2025). That is especially true here, where the legislature has established a comprehensive administrative and enforcement scheme, including oversight by the Oregon Health Authority and the Health Care Market Oversight program, that eliminates any need for private enforcement authority. *See* ORS 415.500, *et seq.*; OAR 409-070-0000–OAR 409-070-0085.

Plaintiffs try to end-run the statute's narrow right of action by vaguely asserting claims for "declaratory relief" and "injunctive relief." But those are not "claims" at all; they are remedies. *See Henry v. Gerber Prod. Co.*, No. 3:15-cv-02201-HZ, 2016 WL 1589900, at *4 (D. Or. Apr. 18, 2016) ("[A]n injunction is a type of relief, not a separate cause of action.") If the cause of action Plaintiffs intend to assert is under the Oregon Declaratory Judgment Act ("ODJA"), rather than the CPM statute itself, that does not help them. If actions under the ODJA could be used to gap-fill or expand statutory rights of action, then all plaintiffs falling outside a statutory right of action could avoid that legislative limitation by claiming to seek a declaratory judgment. *See Bay River, Inc. v. Env't Quality Comm'n*, 26 Or. App. 717, 720 (1976) ("A party cannot ignore the judicial review provisions of the APA in favor of a general equitable or declaratory remedy."). Also, the relief Plaintiffs actually seek is an injunction—a declaratory judgment does nothing for them— and injunctive relief is expressly available in the CPM Act's private right of action, ORS 676.555(5)(b)(C), not in the ODJA. *See Ken Leahy Const., Inc. v. Cascade Gen., Inc.*, 329

Page 17 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

Or. 566, 572 (1999) ("[T]he distinguishing characteristic of a declaratory judgment is the absence of coercive relief.").

The CPM statute establishes a regulatory framework, not a private enforcement tool by which an incumbent contractor like EEP may exclude competitors. Nothing in the statutory text authorizes a private entity to compel a hospital to renew an expired contract or to enjoin the hospital from selecting a different emergency care provider. Plaintiffs' claims must therefore fail as a matter of law.

### b.    Plaintiffs offer no evidence that Defendants have violated or will violate ORS 676.555.

Even if the CPM statute authorized a private right of action for these Plaintiffs—which it does not—Plaintiffs have failed to show any statutory violation. As discussed above, Plaintiffs are not within the class of persons the legislature intended to protect when it enacted ORS 676.555. To prevail on a statutory liability claim under Oregon law, a plaintiff must show both that it falls within the class the legislature intended to protect and that it suffered the type of harm the legislature intended to prevent. *Bellikka v. Green*, 306 Or. 630, 634–35 (1988). Plaintiffs cannot satisfy either requirement.

The CPM statute is concerned with protecting patients and preserving physicians' independent clinical judgment—not with protecting incumbent contractors from losing hospital contracts through ordinary market competition. Here, however, Plaintiffs seek to vindicate only the economic interests of EEP, a for-profit staffing company dissatisfied with PeaceHealth's decision not to renew its contract. Nothing in the statutory text or legislative history suggests any intent to confer enforceable rights on entities like EEP, which do not themselves practice medicine and do not allege interference with their own clinical judgment.

Page 18 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

Nor is the harm EEP contends that it suffered—the nonrenewal of a hospital staffing contract—the type of injury the legislature sought to prevent or remedy. The CPM statute does not exist to guarantee continued revenue, entrench incumbent contractors, or shield private companies like EEP from competition. Because EEP's purported injury falls outside both the statute's protected class and scope of harms, it cannot support statutory liability as a matter of Oregon law.

Plaintiffs' claims also fail because they offer no evidence that any provision of the CPM statute has actually been violated. Plaintiffs offer no evidence that the Apollo Defendants will or have "[e]xercise[d] de facto control over administrative, business or clinical operations of a professional medical entity in a manner that affects the professional medical entity's clinical decision-making or the nature or quality of medical care that the professional medical entity delivers." *See* ORS 676.555(2)(a)(G). Plaintiffs offer no evidence that the Apollo Defendants have or will exercise "ultimate decision-making authority" over any of the eight activities listed in the statute. Indeed, evidence offered by PeaceHealth demonstrates that it is working collaboratively with Lane and ApolloMD to ensure a successful transition that is compliant with Oregon's CPM law. Ruscher Decl. ¶¶ 14–16; Gideon Decl. ¶¶ 32–33. Thus, Plaintiffs do not make the requisite merits showing needed to justify the extraordinary remedy of a preliminary injunction.

Establishing that plaintiffs are likely to succeed on the merits of their claims is a necessary prerequisite to granting a preliminary injunction. *See Winter*, 555 U.S. at 20 (listing requirements for a preliminary injunction, all of which must be established); *Or. Nat. Desert Ass'n v. Kimbell*, No. CIV. 07-1871-SU, 2008 WL 4186913, at *7 (D. Or. Sept. 5, 2008), *vacated in part on other grounds*, 2009 WL 1663037 (D. Or. June 15, 2009) ("likelihood of success on the merits [is] necessary for a preliminary injunction"). Plaintiffs' preliminary injunction submission focuses on everything from public policy arguments to outcry from political leaders, while giving short-shrift

Page 19 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

to the actual legal claim their complaint asserts. Perhaps it is their hope that the Court will be too distracted by atmospherics to focus on whether they have made any showing that the defendants are doing anything that would violate the statute at issue. They have not made any such showing. In the absence of demonstrating an ability to prove their legal claims, the Court should not entertain granting a preliminary injunction.

**C.      Plaintiffs cannot show irreparable harm.**

In addition to the deficiencies in Plaintiffs' merits showing, Plaintiffs also fail to show that they will suffer irreparable harm in the absence of a preliminary injunction, further undermining their request for extraordinary relief. "[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Allegations of irreparable harm must be supported with actual evidence, and not merely conclusory statements or unsupported allegations." *Nevada v. United States*, 364 F. Supp. 3d 1149, 1151 (D. Nev. 2019) (citing *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir. 1988)). In other words, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co.*, 844 F.2d at 674 (emphasis in original). What's more, to establish irreparable harm, preliminary injunction movants must show evidence of harm to themselves; evidence of harm to others does not suffice. *See Immigrant Legal Res. Ctr. v. City of McFarland*, 827 F. App'x 749, 751–52 (9th Cir. 2020). Movants must also demonstrate that equitable relief is necessary because the remedy at law is inadequate. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320–21 (9th Cir. 1994).

###### 1.    Plaintiffs have an adequate remedy at law.

Plaintiffs fail to establish irreparable harm because the injury they actually assert, the loss of a contractual relationship with PeaceHealth, is fully compensable through monetary damages. Ninth Circuit precedent is clear that where alleged harm can be remedied through damages or other legal relief, preliminary injunctive relief is inappropriate. *See, e.g.*, *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("It is well established . . . that such monetary injury is not normally considered irreparable."); *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award."). That principle applies with full force here.

At bottom, Plaintiffs' grievance is that PeaceHealth declined to renew or extend EEP's contracts and instead selected a different provider through a competitive process. If Plaintiffs ultimately prevail on their contention that this decision was wrongful, unlawful, or tainted by improper conduct, their injury would be economic: lost revenue or professional opportunities and downstream business impacts. Those are paradigmatic examples of harms for which money damages provide an adequate remedy. *See* 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2026 ed.) ("[T]ypically the termination of business agreements … are not found to result in irreparable injury because, if wrongful, damages will provide adequate compensation for any losses.").

Courts routinely hold that such contract-based or commercial injuries, even if significant, do not constitute irreparable harm. *See, e.g.*, *Todd v. Chase Manhattan Mortg. Corp.*, No. CV 12-00129-PHX-FJM, 2012 WL 1906505, at *2 (D. Ariz. May 25, 2012) ("Plaintiff is not entitled to injunctive relief on the breach of contract claim because the relief available for a breach of

Page 21 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

contract-money damages-is an adequate remedy at law. The harm, in other words, is not irreparable."); *Savage v. Elevenate, INC.*, No. 3:26-CV-00302-AB, 2026 WL 788937, at *3 (D. Or. Mar. 20, 2026) ("Plaintiffs purported irreparable harm is purely economic. The Court finds that such harm alone is insufficient to support a finding of irreparable harm." (citation omitted)).

Plaintiffs attempt to recast these economic interests as patient-safety concerns, but the evidentiary record does not support that reframing. As discussed above, Plaintiffs have not shown that emergency services are presently unsafe, that care will lapse absent injunctive relief, or that any patient-facing harm is likely to occur. Where the asserted injury is, in substance, the loss of a contractual relationship, the availability of damages forecloses the extraordinary equitable relief Plaintiffs seek. This is especially true where, as here, Plaintiffs seek a preliminary injunction that would grant them relief far exceeding what could be awarded at final judgment. Forcing PeaceHealth to continue contracting with EEP would not preserve the status quo; it would impose a mandatory relationship that Plaintiffs could not obtain through damages or declaratory relief after trial. Equity does not permit the use of a preliminary injunction to secure leverage or contractual reinstatement where legal remedies are adequate.

Because Plaintiffs can be made whole through monetary relief or post-judgment remedies, they cannot satisfy the irreparable-harm requirement. This failure alone is fatal to their motion for a preliminary injunction.

### 2.    Plaintiffs' own conduct belies the existence of irreparable harm

Although Plaintiffs seek the extraordinary remedy of a preliminary injunction, their own conduct undermines assertions that they require emergency intervention by the Court. That is so in at least two respects. First, Plaintiffs' delay in bringing this lawsuit and filing a motion for preliminary injunction itself refutes their pleas of imminent irreparable harm. "A long delay by

plaintiff after learning of the threatened harm . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1. Here, Plaintiffs have known that renewal of their contract would be subject to a competitive RFP process since November; they received notices of nonrenewal of their contracts in December; and they were notified that they were not selected in the RFP process on February 3. *See* Gideon Decl. Ex. 1, Ex. 5; Mattigod Decl. Ex. 2, Ex. 3, Ex. 4. Yet, they did not file suit until March 20, and even then, waited five days to serve it. *See* ECF 1, at ¶¶ 1, 2. They filed no motion for temporary restraining order and waited nearly three weeks—until April 8—to file a motion for preliminary injunction. ECF 5. Under circumstances like these, courts have declined to find imminent irreparable harm. *See, e.g.*, *Or. Nat'l Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1266 (D. Or. 2022) ("This delay [of two months] counsels against a finding of likely irreparable harm.").

Second, Plaintiffs are themselves precipitating the supposedly exigent circumstances by refusing to cooperate in transition planning with PeaceHealth, ApolloMD, and Lane. *See* Ruscher Decl. ¶¶ 16–19. Perhaps it is their right to refuse cooperation. But they should not be heard to raise alarm that Defendants will compromise patient care by lacking adequate preparation for a transition of emergency department management and personnel if they are a cause of the very irreparable injury about which they complain. The leading treatise on civil procedure notes: "Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1. "[I]rreparable injury does not exist where the [plaintiffs] … 'acted to permit the outcome which they find

unacceptable.'" *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1130 (9th Cir. 2024) (citation omitted).[4]

### 3. Plaintiffs' declarations do not establish irreparable harm.

Here, the declarations submitted by Plaintiffs underscore the absence of evidence of irreparable harm. Although the declarants express concern about the upcoming transition, their assertions are uniformly speculative, generalized, and untethered to concrete facts demonstrating that harm is likely to occur absent injunctive relief.

There is one overarching defect in the voluminous record of declarations put forward by plaintiffs: it does not describe irreparable harm *to the Plaintiffs*. "The standard for preliminary injunctions … requires irreparable harm to the plaintiffs themselves." *Immigrant Legal Res. Ctr.*, 827 F. App'x at 751; *see also Nat'l Wildlife Fed'n v. Nat"l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) ("Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction."). "[T]he prospect of harm to third parties" is not material to establishing the element of irreparable harm. *Immigrant Legal Res. Ctr.*, 827 F. App'x at 751–52. Indeed, the Ninth Circuit has reversed district courts for granting preliminary injunctions based on asserted irreparable harm to nonparties. *See, e.g.*, *id.*

Here, the declarations submitted by Plaintiffs rely on speculation that PeaceHealth, Lane, and ApolloMD have not adequately prepared for a transition and, thus, will jeopardize continuity of patient care in the RiverBend, PeaceHarbor, and Cottage Grove emergency departments. Setting

---

[4] Lane, Apollo, and PeaceHealth have made clear many times that they hope many of the existing EEP physicians will continue to work in PeaceHealth's Lane County emergency departments after the transition. Of course, EEP physicians are free to pursue other professional opportunities instead. But they should not be heard to claim that an ED staffing shortage has created imminent irreparable harm to the community when their own choices have precipitated those alleged circumstances.

to the side that declarants have little or no personal knowledge of transition plans underway by PeaceHealth, Lane, and ApolloMD, even if their speculation were right, it would not establish irreparable harm *to them* sufficient to sustain a preliminary injunction.

### a.  The Hunter, Sabah, and Beardsley declarations.

Dr. Allan Hunter, Dr. Judith Sabah, and Dr. Robert Beardsley each submit substantially similar declarations in which they opine that patients "will be at significant risk" and that quality and availability of care "will be significantly reduced" if PeaceHealth's transition proceeds. Sabah Decl. (ECF 8) ¶ 4; Hunter Decl. (ECF 9) ¶ 4; Beardsley Decl. (ECF 10) ¶ 4. But these doctors do not identify any specific staffing shortfall, lapse in coverage, credentialing failure, or patient safety incident that is likely to occur. Nor do they claim personal knowledge of the staffing plans, physician credentials, or operational readiness of the successor provider. Their concerns about inefficiencies and the use of temporary physicians are couched entirely in conditional and predictive terms, without any factual foundation demonstrating that such outcomes are imminent or unavoidable. Under Ninth Circuit precedent, such conjecture does not establish irreparable harm. *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir. 1985) ("We have long since determined that speculative injury does not constitute irreparable injury."); *see also, e.g.*, *Koller v. Brown*, 224 F. Supp. 3d 871, 880 (N.D. Cal. 2016) (holding that "articulation of harm based only on possibility or risk does not constitute a 'clear showing' that a non-speculative, imminent injury is likely to occur in the absence of" preliminary relief).

### b.  The Orton declaration.

Dr. Corey Orton's declaration similarly relies on assumptions rather than evidence of likely irreparable injury. Dr. Orton states that he has participated in "multiple meetings" with transition teams but contends there has been "no actual explanation of a meaningful plan." Orton Decl.

(ECF 7) ¶ 4. That assertion is conclusory and unsupported. Dr. Orton does not identify what information he requested and did not receive, what specific aspects of the plan were deficient, or how any such deficiency would translate into imminent patient harm. Of course, Dr. Orton's assertion that he has not received an "explanation of a meaningful plan" presumes that he *should* have received such a plan. But he does not say that he is in planning meetings with Lane and ApolloMD because he is not. Indeed, EEP has pointedly declined to participate in transition planning. Ruscher Decl. ¶¶ 16–19.

Courts reject irreparable-harm claims resting on professional disagreement with operational decisions or on predictions of inefficiency during a transition—particularly where the defendant has engaged in advance planning and mitigation. *See, e.g.*, *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 963 F. Supp. 1083, 1095 (D. Utah 1997) (finding inadequate showing because "[t]here is no evidence that human injury or environmental harm is inevitable or likely. In fact, the record suggests that TOCDF's safety equipment and procedures are effective in preventing such harms."). Dr. Orton's declaration reflects policy disagreement and frustration with change, not the type of concrete, imminent injury necessary to justify preliminary relief.

### c.     The Fantozzi and Rompala declarations.

The declarations of Rose Fantozzi and Christopher Rompala suffer from the same defects. Both declarants state—nearly verbatim—that patients "will be at significant risk" and that care "will be significantly reduced" if the transition occurs. Rompala Decl. (ECF 11) ¶ 4; Fantozzi Decl. (ECF 12) ¶ 4. Yet neither identifies any concrete deficiency in PeaceHealth's transition planning, any specific inability of the new physician group to staff shifts, or any actual interruption in emergency services that has occurred or is likely to occur.

Mr. Rompala further speculates that staff morale may suffer or that some providers "may

Page 26 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

152637142.5 0065738-00104

leave," and that some patients have expressed concern about future care. Rompala Decl. ¶¶ 7, 9. But courts in the Ninth Circuit routinely reject irreparable-harm claims premised on predictions of what "may" or "likely will" occur. Further, speculation about possible future attrition or patient anxiety—without evidence of actual departures, cancelled shifts, or reduced capacity—falls well short of the showing required for preliminary injunctive relief. *See St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 108 (2d Cir. 2025) (rejecting claims that hospitals system's actions "have caused its clinicians to become afraid and concerned about their future employment and led potential recruits to rethink their commitments to join" the anesthesiology group as insufficient to establish irreparable harm).

### d.    The Anderson declaration.

Although lengthier, the declaration of Brad Anderson, EEP's president, does not establish irreparable harm either. Many of Mr. Anderson's assertions are framed not as observed facts but as predictions, opinions, or advocacy positions aligned with EEP's litigation and business interests. For example, Mr. Anderson repeatedly asserts that Defendants "have no credentialed physicians" and that staffing emergency departments by the transition dates is impossible. Anderson Decl. (ECF 6) ¶¶ 4–11. These statements ignore contrary evidence in the record submitted by the Apollo Defendants showing ongoing recruitment, credentialing, and operational preparation, *see generally* Apollo Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, and they rest largely on Mr. Anderson's assumptions about what other entities can or cannot accomplish.

Mr. Anderson also relies heavily on worst-case hypotheticals—asserting that emergency credentialing will necessarily lead to insufficiently vetted physicians, or that safe staffing is "zero" percent likely. Anderson Decl. ¶¶ 6–12. Such absolute predictions underscore the speculative

Page 27 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

152637142.5 0065738-00104

nature of the claimed harm. Courts are clear that unsupported fear and worst-case scenario projections do not establish irreparable injury. *See, e.g.*, *Caribbean Marine Servs. Co.*, 844 F.2d at 675–76 ("Subjective apprehensions . . . are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm."); *Johnson v. Brown*, 567 F. Supp. 3d 1230, 1260 (D. Or. 2021) (explaining that fears that the plaintiffs' vaccine exemptions "will be revoked at some point or circumstances will otherwise change are speculative and not sufficiently imminent" to show irreparable injury).

Moreover, large portions of Mr. Anderson's declaration recount EEP's dissatisfaction with the RFP process, PeaceHealth's communications, and the loss of EEP's longstanding contractual relationship. Anderson Decl. ¶¶ 16–22. Those are the real grievances that are at work: they are not irreparable harms cognizable in equity. The impending expiration of EEP's contract—by its own terms—does not transform speculative operational concerns into imminent constitutional or equitable injury, particularly where Plaintiffs seek relief that would force continuation of a contractual relationship to which they have no legal entitlement.

e.      The Deedon declaration.

The declaration of Brett Deedon repeats many of the same conclusory and predictive assertions found in Plaintiffs' other submissions. Mr. Deedon states that if the transition proceeds, patients "will be at significant risk" and emergency care quality "will be significantly reduced." Deedon Decl. (ECF 13) ¶ 4. These statements are phrased in absolute terms, but they are unsupported by specific facts, examples, or personal observations demonstrating that harm is imminent or unavoidable.

Like the other declarations, Mr. Deedon's statements rely on assumptions about the use of "transient" physicians and speculative predictions of degradation in care. Concerns about

Page 28 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

coordination challenges during a transition—without evidence of actual breakdowns or imminent failures—do not justify provisional relief. *See J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1378 (Ct. Int'l Trade 2020) (unsupported assertions that a business plan needs revisions "are too vague to lend significant probative weight in support of a finding of likely irreparable harm").

### f.    The Stapleton declaration.

The declaration of Karen Stapleton underscores the fundamental gap in Plaintiffs' irreparable-harm showing. Ms. Stapleton states that her minor child has previously received emergency care at PeaceHealth and, due to an underlying condition, may need emergency services again in the future. Stapleton Decl. (ECF 14) ¶¶ 2–4. Those facts do not establish any imminent injury—let alone irreparable harm—that would result from denial of injunctive relief.

Critically, Ms. Stapleton does not identify any anticipated interruption in emergency services, any lapse in care currently occurring, or any specific deficiency in PeaceHealth's transition planning that would put her child at risk. Nor does she assert that emergency departments are presently unsafe or that they will become unavailable at any identifiable time absent Court intervention. The declaration contains no predictive statements about the transition at all; it simply assumes that future need for emergency care is sufficient to justify extraordinary equitable relief. It is not. Irreparable harm must be "likely" and imminent—not based on the abstract possibility that a plaintiff may someday require care.

In the end, Plaintiffs' numerous declarations share the same fatal defect: none identifies a concrete, imminent injury that is likely to occur absent injunctive relief. Across clinicians, nurses, and union representatives, the declarations rely on generalized fears about change, predictions of inefficiency, and worst-case assumptions about future staffing—often expressed in conditional or absolute terms untethered to specific facts, timelines, or observed failures. No declarant identifies

Page 29 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

152637142.5 0065738-00104

an actual lapse in emergency coverage, an unavoidable staffing shortfall, a breakdown in credentialing, or a discrete patient safety event that is likely to occur if the transition proceeds as planned. Several declarations simply establish professional disagreement with PeaceHealth's decision or abstract concern about continuity, while others speak only to generalized community anxiety. Under Ninth Circuit precedent, such speculation, conjecture, and policy disagreement do not constitute irreparable harm. Where, as here, the record shows active, detailed planning to ensure continuity of emergency services, Plaintiffs' apprehension about potential change cannot justify the extraordinary remedy of a preliminary injunction.

Moreover, the relief Plaintiffs seek would itself create a serious risk of irreparable harm. Enjoining PeaceHealth from implementing the results of its competitive process would halt or reverse active transition efforts at a critical stage, undermining staffing certainty and operational preparedness weeks before scheduled contract expirations. In contexts involving healthcare delivery, courts recognize that disruptions to planning and coordination pose immediate and irreparable risks to patients and providers alike. The Ninth Circuit does not require courts to ignore these realities when weighing irreparable harm.

**D.      The balance of the equities weighs decisively against a preliminary injunction.**

To qualify for injunctive relief, the plaintiffs must establish that "the balance of equities tips in [their] favor." *Winter*, 555 U.S. at 20. "In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1203 (9th Cir. 1980)*). Thus, the balance of equities factor of the preliminary injunction analysis requires the Court to weigh the concrete harms that would result from granting injunctive relief against those that would result

Page 30 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

from denying it. Where, as here, an injunction would impose operational burdens on non-parties or disrupt essential public services, the equities must be carefully assessed. And in this case, they tip decisively in PeaceHealth's favor.

If an injunction issues, PeaceHealth and the Apollo Defendants would be forced to halt or unwind months of coordinated transition planning undertaken to ensure uninterrupted emergency care at PeaceHealth hospitals. That planning involves physician recruitment and credentialing, staffing schedules, operational training, and regulatory coordination—processes that cannot simply be paused and restarted without consequence. An injunction at this stage would inject uncertainty into emergency department operations precisely when final preparations are underway, increasing risks of staffing gaps, inefficiencies, and confusion. Those harms would not fall on PeaceHealth alone, but on patients, clinicians, and hospital staff who depend on stable operations.

By contrast, Plaintiffs identify no comparable harm if there is no injunction. EEP's existing contracts will expire by their own terms, and Plaintiffs' asserted injuries flow from the natural end of a contractual relationship and disagreement with the outcome of a competitive selection process. Denial of an injunction would not leave Plaintiffs without recourse. They remain free to litigate their claims on the merits, seek declaratory relief, or pursue any remedies available under law. An injunction, however, would impose immediate and potentially irreversible consequences by constraining PeaceHealth's ability to manage emergency services and meet obligations to the public. Equity does not favor imposing such risks absent a clear showing of necessity.

In short, the injunction Plaintiffs seek would affirmatively alter the current trajectory of emergency care planning, impose substantial operational burdens on PeaceHealth, and risk harm to patients and communities. Denial of injunctive relief, by contrast, preserves stability and allows

Page 31 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

emergency services to proceed as planned while this case is resolved. The balance of equities therefore strongly favors PeaceHealth and militates against issuance of a preliminary injunction.

**E.      The public interest favors denial of injunctive relief.**

Plaintiffs claim fails on the public interest prong of the preliminary injunction analysis, as well. "[C]ourts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Stormans, Inc.*, 586 F.3d at 1139 (cleaned up). "However, the district court need not consider public consequences that are 'highly speculative.'" *Id.* (citation omitted). "In other words, the court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.*

Here, the public interest is served by ensuring the continuous, safe, and orderly delivery of emergency medical care to the communities PeaceHealth serves. Courts have long recognized that requests for injunctive relief affecting healthcare operations require particular caution, because the consequences extend beyond the litigants to patients, providers, and the public at large. Here, the public interest weighs strongly against an order that would halt an ongoing transition process designed precisely to avoid disruption in emergency services.

PeaceHealth undertook advance planning to prepare for expiration of emergency physician services contracts, not in reaction to any alleged deficiency in care. That planning included a competitive evaluation focused on patient-care quality, staffing sufficiency, recruitment capacity, and transition readiness, followed by months of coordinated preparation to ensure that emergency departments would remain operating smoothly when the transition occurs. From a public-interest perspective, such forward-looking stewardship is not only appropriate, it is essential. Emergency

Page 32 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

departments cannot be staffed, credentialed, and operationally prepared overnight; they require sustained coordination among hospitals, physicians, credentialing bodies, and regulators.

Judicially freezing that process at this stage would undermine—rather than promote—public confidence in the availability of emergency care. An injunction would inject uncertainty into staffing, training, and operational readiness mere weeks before scheduled contract expirations, creating precisely the risk of instability that courts seek to avoid in the preliminary-injunction context. That risk is especially acute where, as here, the requested relief would compel the continuation of a provider relationship beyond its negotiated term, notwithstanding the hospital's documented preparations for a lawful and orderly transition.

By contrast, Plaintiffs have not shown that denial of an injunction would compromise patient safety or reduce access to emergency services. PeaceHealth has demonstrated that it has planned extensively to ensure continuity of care, whereas Plaintiffs' request would interrupt those efforts without any corresponding benefit to the public. The public interest therefore favors allowing PeaceHealth to complete the transition it has responsibly planned, rather than imposing an emergency judicial intervention that could destabilize essential healthcare services.

Because the requested injunction would risk harm to patients and the community while preserving no legitimate public benefit, the public interest favors denial of Plaintiffs' motion.

**F.    A provisional remedy, if determined to be necessary, should be narrowly tailored and should not compel a provider relationship.**

Even if the Court were to conclude that some provisional relief is warranted, long-settled principles of equity require that any injunction be narrowly tailored to address the specific legal concern identified and should avoid altering the status quo more than necessary. *See, e.g.*, *Hecox v. Little*, 104 F.4th 1061, 1089 (9th Cir. 2024) (preliminary "injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad injunction is an abuse of discretion"), *as*

Page 33 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*amended* (June 14, 2024), *cert. granted,* 145 S. Ct. 2871 (2025).

Preliminary injunctions are not vehicles for restructuring contractual relationships or imposing mandatory obligations beyond what is required to prevent unlawful conduct. Rather, courts are directed to adopt the least intrusive remedy that preserves the ability to adjudicate the merits without inflicting unnecessary harm. *Pacito v. Trump*, 169 F.4th 895, 919 (9th Cir. 2026) ("A trial court abuses its discretion by fashioning an injunction which is overly broad." (quotation marks omitted)); *City & County of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) ("We have long held that an injunction 'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.'" (quoting *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)).

Here, Plaintiffs ask the Court to do precisely what equitable principles caution against: to upend a lawful contracting decision by forcing PeaceHealth to continue doing business with a provider whose contract is expiring by its own terms and which was not selected through a competitive process. That relief would not merely maintain the status quo—it would affirmatively alter it by compelling an involuntary provider relationship and disrupting emergency department planning already well underway. Courts are especially reluctant to impose such mandatory injunctions, particularly in complex healthcare settings where operational decision-making is time-sensitive and patient-centered. *See, e.g.*, *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1037–38 (D. Ariz. 2021) (declining to issue mandatory preliminary injunction when the plaintiffs sought "an injunction that not only enjoins Defendant from enforcing the law, but orders Defendant to take an affirmative action by providing coverage for a medical procedure that would be otherwise excluded, thus going well beyond the status quo"); *see also Jeffrey v. St. Clair*, 933 F. Supp. 963, 967–68 (D. Haw. 1996) (declining to issue prohibitory preliminary injunctive relief

Page 34 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

against Hawaii State Hospital's psychiatric program, in part, because "the courts are duty-bound to make sure that professional [medical] judgment is exercised," explaining that "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made," and  that "[t]he exact contours of relief should be left to the sound discretion of experts in the field" (cleaned up)).

Importantly, Plaintiffs' legal theory does not require that result. Their claim, at bottom, is that Defendants may fail to comply with Oregon's corporate practice of medicine restrictions. If that concern were credited at this preliminary stage, the appropriate response would be prospective and supervisory, not coercive and disruptive.

The narrowest and most appropriate form of provisional relief, if any, would therefore be limited to ensuring compliance with ORS 676.555's requirements during the transition period. That could include, for example, requiring Defendants to maintain certifications of compliance, provide transparency to regulators, or refrain from conduct expressly prohibited by the statute pending final resolution on the merits. Such relief would address the legal concern Plaintiffs raise without forcing PeaceHealth to unwind its contracting decision, displace an RFP outcome, or abandon its transition planning altogether. *See A. H. R. v. Wash. State Health Care Auth.*, 469 F. Supp. 3d 1018, 1049 (W.D. Wash. 2016) (approving of preliminary injunctive relief when limited in scope to "requir[ing] only that defendants supply the services that the court found to be required under federal law," and did not "mandate detailed or burdensome procedures for compliance"). The Court could assume a monitoring role to ensure compliance with ORS 676.555. It could also appoint a third-party monitor to provide oversight of compliance with ORS 676.555 during the transition period. To be clear, PeaceHealth is not acceding to or inviting this kind of intrusion; it is PeaceHealth's position that a preliminary injunction of any kind is unwarranted. But, if the Court

Page 35 – DEFENDANT PEACEHEALTH'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
152637142.5 0065738-00104

disagrees and wishes to impose some kind of provisional injunctive measure, it has many options tailored to compliance with ORS 676.555 that do not involve forcing PeaceHealth to engage EEP.

An injunction barring Lane or ApolloMD from operating in whole or in part, or compelling PeaceHealth to retain EEP against its judgment, would far exceed what equity permits at this stage. It would grant Plaintiffs substantive relief they could not obtain at final judgment, intrude into an area of hospital governance traditionally committed to institutional expertise, and create precisely the operational instability this Court has reason to avoid.

To the extent that Plaintiffs' concerns are legitimately about patient safety, the Court has other options at its disposal. Rather than permit EEP to continue to seek to obstruct the consummation of a new contract that will take-over the emergency medicine services they currently provide to this community, the Court could order EEP to participate fully in the transition process to proactively address any of the patient-safety concerns they claim to have.

Accordingly, if the Court determines that some preliminary relief is appropriate, it should be limited to prospective compliance measures tied directly to the statutory requirements at issue—and should not mandate continuation of a contractual relationship or override PeaceHealth's lawful, patient-focused decision regarding how emergency services will be provided.

## V. CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

DATED:  April 20, 2026                     Respectfully submitted,

STOEL RIVES LLP

MISHA ISAAK, Bar No. 086430
misha.isaak@stoel.com
KEVIN R. SCHOCK, Bar No. 181889
kevin.schock@stoel.com
KATHARINE S. SHEPHERD, Bar No. 224891
kate.shepherd@stoel.com

*Attorneys for Defendant PeaceHealth*

## LR 7-2(b) CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under Local Rule 7-2(b) because it contains 10,995 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED:  April 20, 2026

_____
MISHA ISAAK, Bar No. 086430
misha.isaak@stoel.com

*Attorney for Defendant PeaceHealth*