IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| KAREN STAPLETON, as guardian ad litem for Jane Stapleton, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 6:26-cv-00684-MTK |
| PEACEHEALTH, a Washington nonprofit corporation, et al., | ) | |
| Defendants. | ) | |

Motion Hearing

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT JUDGE

May 6, 2026

APPEARANCES

FOR THE PLAINTIFFS:

TODD R. JOHNSTON
Hershner Hunter, LLP
675 Oak Street
Suite 400
Eugene, OR 97401

FOR THE PLAINTIFFS:

ALEXANDRA P. HILSHER
Hershner Hunter, LLP
675 Oak Street
Suite 400
Eugene, OR 97401

FOR DEFENDANT PEACEHEALTH:

MISHA ISAAK
Stoel Rives LLP
760 S.W. Ninth Avenue
Suite 3000
Portland, OR 97205

FOR DEFENDANT PEACEHEALTH:

KEVIN R. SCHOCK
Stoel Rives LLP
760 S.W. Ninth Avenue
Suite 3000
Portland, OR 97205

FOR DEFENDANTS APOLLOMD & LANE EMERGENCY PHYSICIANS:

JEFFREY G. BRADFORD
Tonkon Torp LLP
1300 S.W. 5th Avenue
Suite 2400
Portland, OR 97201

FOR DEFENDANTS APOLLOMD & LANE EMERGENCY PHYSICIANS:

JASON POPP
Alston & Bird LLP
1201 W. Peachtree St.
Atlanta, GA 30309

COURT REPORTER: Lindsey A. Weresch, RMR, CRR, CSR
United States District Courthouse
1000 S.W. Third Avenue, Room 301
Portland, Oregon 97204
(503)326-8047

(Wednesday, May 6, 2026, 9:07 a.m.)

**P R O C E E D I N G S**

(Whereupon, the following proceedings were held in open court:)

THE COURTROOM DEPUTY CLERK: Please remain seated.

The United States District Court for the District of Oregon is now in session, the Honorable Mustafa T. Kasubhai.

THE COURT: Good morning, counsel. Thank you for being available, and being available here in Portland.

Mr. Johnston.

MR. JOHNSTON: Good morning, Your Honor.

We'd like to announce to the Court that the parties have this matter settled. We have an agreement on all material terms. We have an agreement to meet with a federal settlement judge as a czar if there's a disagreement on any nonmaterial terms. And we'd ask the Court for an order allowing 14 days to finalize a physician services agreement and get a dismissal filed.

THE COURT: All right. And the material terms are what?

MR. JOHNSTON: There are four different pages of them.

THE COURT: Recite them. I mean, I can't imagine this is going to be kept confidential and parties-eyes-only. Or is it?

MR. ISAAK: So, Your Honor, what has been negotiated is not a conventional settlement agreement. What's been negotiated is like a services agreement between the hospital and the Eugene Emergency Physicians.

And so -- and what has been agreed to, to date, is just a term sheet that outlines in broad brushes what will be negotiated further over the next two weeks.

THE COURT: All right. And go ahead and memorialize them on this record to the extent that you have any of these general principles laid out.

MR. ISAAK: Would Your Honor like us to -- I mean, there's a long document. I have only received it myself this morning and was not involved in the creation of that document. Would you like us to submit that document for the record?

THE COURT: You're welcome to do that. But is there any objection to reciting it orally on this record? I have until 2:00 p.m. You know, I've got all the time in the world for you, Mr. Isaak. So talk to me.

I mean, I get you've reached an agreement, and that's great. But it's been my practice and expectation, when presiding over settlement conferences, that we memorialize it on the record.

And, frankly, given the incredibly public nature of these proceedings, the topic itself, and the immense and appropriately allocated public interest, if we are going to

move forward through some resolution that recognizes all the necessary interests here, this might be the time to start.

MR. ISAAK: Yes. So just -- I've just consulted with my client. And I'll just say, on behalf of my client, while we understand that the controversy that's been submitted is a controversy of great public interest, we don't think that the ultimate contract for services that is reached between the hospital and Eugene Emergency Physicians and the details of those terms are themselves of great public interest.

Obviously, the public, I'm sure, is interested to know that there has been agreement reached. And the agreement is for a contract for services between PeaceHealth and Eugene Emergency Physicians. But I guess our position would be that we don't think that the exhaustive detail of those terms are a great matter of public interest and would ordinarily be disclosed to the public.

THE COURT: Well, not ordinarily disclosed, but they would be -- would they be ordinarily kept confidential between contracting parties with the -- with the relationship between the hospital and the physicians group?

MR. ISAAK: I think the answer to that question is yes.

MR. JOHNSTON: Your Honor, one approach may be -- so I have the agreement only on text, which, even with my glasses, is a little challenging to read. However, if we recessed for a

few minutes, it may be that, between PeaceHealth and plaintiffs, we could sit down and describe a handful of the material terms without raising any confidentiality concerns and -- and then present that to the Court. Or we can forward you a copy of this in camera to look at. I'm just thinking out loud.

THE COURT: Let's take a ten-minute recess. I'll let all of you huddle and figure out what you think would be the principal material terms of the agreement that -- that you all agree to recite on the record.

Be advised I will be asking you questions, and I may ask questions about additional details that I will expect for you to respond to and answer, and answer as completely as you can, with the understanding that if it's cagey, I will probe further.

MR. ISAAK: Well -- and, Your Honor, to that point, just to set the Court's expectations, I mean, as litigation counsel, we were not actually involved in negotiating the settlement agreement. I've told the Court I've received the settlement agreement for the first time myself within the last -- I don't know -- hour, hour and a half in my e-mail. So --

THE COURT: Actually, this raises -- let's roll this back a little bit. Mr. Johnston just bowled us all over --

MR. ISAAK: That's why we picked him.

THE COURT: -- after having driven up to Portland late last night.

MR. JOHNSTON: That's fair.

THE COURT: So I want to make sure we're all on top of what's, in fact, happening.

Mr. Johnston, were you counsel that was -- that was involved in -- that were involved in the negotiation with PeaceHealth?

MR. JOHNSTON: Your Honor, I believe we were involved in the same way that Mr. Isaak was, in that both PeaceHealth and Eugene Emergency Physicians were working together without litigation counsel involved. And it was not until this morning that we received a copy of the written agreement either. And so we've been in touch and talking with the parties, but not directly involved in the negotiation itself.

THE COURT: Okay. Well, then you're at least on an equal playing field, which is great. That's all I need, is to make sure that we're all on level ground here with respect to what happened.

And, frankly, if I need to call up witnesses from the parties that have negotiated it, then that's what I'll do. I'm going to see this part of it to the end. And I'm grateful that the case has been resolved in some way that I'm assuming is going to provide emergency care to the three hospitals in Lane County and to the community in Lane County.

That's -- I mean, that's, I think, key in the -- and incredibly important. I'm grateful for that. And, at the same time, this case has opened up quite a few questions, concerns, and -- and the -- the presence of 676.555 is still sort of -- sort of a looming regulatory body of law that -- that I want to make sure is -- has been in some way acknowledged and resolved so we can all move forward.

So I want to -- I want to make sure that I understand what the lay of the land is now and what it's going to look like. You also described some kind of czar of sorts, and I want to understand more about what that means. So I want to also know timelines and how all of this is going to be put into effect, such that there won't be an interruption in services.

I'm involved, whether anyone likes it or not, unless the case gets dismissed. And I'm not sure I might let go of it even then. So I -- I want to make sure I understand what's going on.

I take it from what you've described, Mr. Johnston, that the settlement is with -- is between Plaintiff EEP -- that's one of the parties that have settled?

MR. JOHNSTON: All plaintiffs, Your Honor.

THE COURT: So EEP, Stapleton, and Dr. McGee?

MR. JOHNSTON: Correct.

THE COURT: And I should say Ms. Stapleton and Dr. McGee.

MR. JOHNSTON: Correct.

THE COURT: All right. And ApolloMD and the other various defendants, other than PeaceHealth, are not part of this negotiated settlement?

MR. JOHNSTON: I'll let them speak for themselves. I believe all defendants are in agreement with plaintiffs.

THE COURT: Okay. All right. I'm going to take ten minutes. You figure out how you're going to coordinate the most transparent description of this negotiated resolution, and I will be prepared to ask questions and get further details.

MR. JOHNSTON: Thanks, Your Honor.

THE COURT: We're in recess.

(Recess taken, 9:17 a.m. - 9:32 a.m.)

THE COURTROOM DEPUTY CLERK: Court is back in session.

THE COURT: Counsel, have you had a chance to talk with each other --

MR. JOHNSTON: We have, Your Honor.

THE COURT: -- figure out what you're going to tell me about the settlement and be prepared for me to ask questions?

MR. JOHNSTON: We're prepared for at least the first part of that.

THE COURT: Well, I mean, I don't want you to be too prepared for the second part.

MR. JOHNSTON: Okay. Well, so, again, foundationally all of the material terms have been agreed to between plaintiffs and PeaceHealth. And we would ask the Court, as part of this, to appoint a settlement czar to the extent that there are any future disagreements about any nonmaterial --

THE COURT: Why wouldn't I simply just retain jurisdiction?

MR. JOHNSTON: I suppose that is another option. I haven't thought through --

THE COURT: There probably wouldn't be any other judge at this stage of the process who would be as familiar with the facts, the players, the arguments, the Senate Bill 951.

Not that I'm asking for more work, but I'm also interested in making sure that litigation is minimized. If, in fact, there's an effort to get this case settled, resolved, and move on with providing the critical services for our communities, I mean, you know, unless -- and, look, if there's a legitimate concern that you have about my role to play as retaining jurisdiction to resolve legal disputes, which would be an interesting piece to actually argue because I would be the one who would be responsible for resolving legal disputes.

MR. JOHNSTON: Right. And we'd probably -- our anticipation is we're not going to need any help, but maybe we can table who that person may be. We don't have any objection

to any sort of arrangement. But, again, I don't -- I doubt we're going to need that sort of help.

THE COURT: Well, then if you don't -- if you doubt you won't need the help, then I will retain jurisdiction, unless the parties can convince me that I shouldn't.

MR. ISAAK: The only thing -- I'm not objecting to Your Honor retaining jurisdiction. But, just so Your Honor understands the scope and sort of size and shape of what we're talking about here, what -- Your Honor knows that what's been negotiated is a term sheet. We've asked the Court to suspend proceedings for a period of 14 days so that we can work -- we can actually, you know, do the legal work of papering that deal further.

The only thing that the settlement czar, quote-unquote, contemplates is resolution of what we've referred to as nonmaterial terms, which I -- and not resolution of material terms, which, you know, I -- the lawyers in this case are all working together very well.

I don't -- like Mr. Johnston said, I don't anticipate that there will be disputes over nonmaterial terms. But we just want to provide a mechanism, you know, if there's a dispute over a, you know, choice of lower venue provision, that kind of a thing, we would just have a mechanism for that to just be resolved.

The only thing for Your Honor to think through about

whether Your Honor wants to appoint another judge or retain jurisdiction is just that it's not impossible -- although exceedingly unlikely, it is not impossible that the deal could somehow fall apart in the next two weeks and litigation could be back on -- that's why we take a two-week period to paper the deal -- in which case we could wind up again litigating the merits in front of the Court.

And so if Your Honor would be concerned about both acting in the role of settlement czar over nonmaterial terms and then the possibility of litigation being back on and potentially sitting as judge of the case, that's the only issue I'm just raising to the Court's attention.

THE COURT: I think that's a legitimate concern. And, to the extent that you're asking for a settlement czar, as opposed to a judge to resolve nonmaterial terms of -- that might come -- that might become a dispute down the road, those are two different roles to play.

I mean, so we -- it'd have to be -- we'd have to be clear on what that point might be. And, frankly, I could retain jurisdiction as the decision-maker over the application of law to whatever facts come up in dispute with the opportunity to refer settlement down the road to somebody else.

MR. ISAAK: Yeah. And we -- also, you haven't heard the general contours of the agreement yet from Mr. Johnston. But, to the extent Your Honor has concerns about Senate Bill

951 compliance, we think, when you understand the terms of the agreement, you'll see there is no Senate Bill 951 -- ongoing Senate Bill 951 compliance issue once this agreement is finalized and implemented.

THE COURT: Okay. Hence the reason why you need to give me all the details here on the record because, as you can tell, I'm not going to be satisfied with general discussion descriptions. You dragged me into this, counsel, and now we're going to -- we're going through it together.

MR. JOHNSTON: So to that end, Judge, the material terms are as follows: The PSA is a contract for services between EEP and PeaceHealth only. There's no contemplation of involvement of Apollo or LEP in that contract or that arrangement.

The term is three years, beginning June 1st and July 1st; so there will be no continuity of care issues. The RiverBend and Cottage Grove facilities will continue to be staffed by Eugene Emergency Physicians. The expectation relating to Florence is that it will maintain the status quo. Those folks, I believe, are employed directly by PeaceHealth.

The parties have terms reflecting their commitment to cooperate and -- that include data transparency going forward.

THE COURT: What does that mean? "Data transparency going forward," what are the parties agreeing on about -- what about data transparency?

MR. JOHNSTON: You may have to ask the parties specifically. My understanding is --

THE COURT: And do we have someone from PeaceHealth who can speak on these points?

MR. JOHNSTON: Probably. Do you want me to run through the --

THE COURT: Yeah, in a bit. But I can see Drs. McGee and Dr. Anderson here on behalf of EEP and on behalf of himself, but who's here as -- who would speak on behalf of PeaceHealth?

MR. ISAAK: Well, I can tell Your Honor I think that the principals who were negotiating on behalf of PeaceHealth are not here. PeaceHealth's in-house counsel is here. But, like -- and, you know, they, I think, also had more involvement than certainly I did. For instance, I heard the term "data transparency" for the first time within the last ten minutes. But, yeah, our principals are not here in court right now.

THE COURT: All right. So the transparency of terms are going to be important for me to be able to move forward and let you all go. And confirmation and understanding, particularly with any of my questions that are coming up, and the understanding of the plaintiffs' and PeaceHealth's agreement memorialized will also be important for me to be able to walk away from because, if I'm going to give you 14 days to work out remaining details, I want to make sure that the

primary details are for -- you know, are, for the most part, understood and agreed to.

So let's see where we're headed. And if I find that there's going to be some kind of issue with a term or a consideration or definition, then I imagine there are some folks from PeaceHealth that work and live up here in the Portland area, right?

MR. JOHNSTON: And Dr. --

THE COURT: I guess I'm looking at you, Mr. Isaak.

MR. ISAAK: Well, if your question is whether or not the principals who were involved in negotiating this agreement work and live up here, I don't know the answer to that. I think that principally they -- the individuals involved don't work and live up here, but --

THE COURT: Okay. So who were the principals for PeaceHealth who were involved in negotiating these terms?

MR. ISAAK: Heather Wall, who is the interim chief executive of Oregon, lives in Eugene.

THE COURT: Okay.

MR. ISAAK: Alicia Beymer, who is sort of in charge of the transition, also lives and works in Eugene.

THE COURT: Okay.

MR. ISAAK: And I think -- I think those were the two principals.

(Whispered discussion, off the record, 9:41 a.m.)

MR. SCHOCK: Mark Korth.

MR. ISAAK: And he's also in Eugene.

THE COURT: Who?

MR. ISAAK: Mark Korth.

THE COURT: Core?

MR. ISAAK: Korth, t-h.

MR. SCHOCK: K-o-r-t-h.

THE COURT: Okay. I take it they're also available by phone?

MR. ISAAK: I could certainly find out.

THE COURT: All right. Well, maybe somebody can instant message them, or something like that, to let them know that the Court may be calling them to discuss terms and be available.

MR. ISAAK: All right. And, of course, Your Honor also knows there is -- there is a document that if Your Honor has specific questions about what individual terms are, we can certainly read from the document or otherwise answer questions with reference to the document.

THE COURT: You're reading off of a document, or are you now providing a summary of the -- of the term sheet?

MR. JOHNSTON: I'm providing the Court with a summary of the material terms that the parties have agreed to, that our hope is will give the Court some comfort that we have thought through Senate Bill 951, the arrangement, and all of the

material terms of that arrangement. And we have an agreement that will not only provide for continuity of care, but will do so well within the confines of Senate Bill 951.

THE COURT: Well -- all right. So we took a detour off of data transparency.

MR. JOHNSTON: That's right.

THE COURT: So I still don't know what that means.

MR. JOHNSTON: Sure.

MR. SCHOCK: I was going to say, Your Honor, my client has said that they're okay with me reading this into the record, the provision of the agreement, if that would be helpful to the Court.

THE COURT: You mean the four pages?

MR. SCHOCK: Not the full four -- that provision, the data transparency --

THE COURT: By the way, I want to make sure you all understand that I haven't let anyone off the hook about reading the entire set of provisions, all four pages into the record. I want to make sure that there is -- if we're talking about transparency in one space, I'm thinking about the transitive property of transparency.

MR. SCHOCK: Sure. But, to answer the specific question what is meant by data transparency and reporting, this is what the parties contemplated: That "Emergency medicine physicians and clinicians and PeaceHealth will share quality

data, throughput data, patient experience data, length of stay, staffing turnover, action plan performance, and other applicable metrics.

"PeaceHealth will consult with emergency medicine physicians and clinicians on the appropriate data and reporting metrics to be disclosed to the medical executive committee, community health boards, community stakeholders, government officials, and other applicable stakeholders."

So they'll work together to figure out what data is needed to assess the quality of services that are being provided and work with community stakeholders, government officials to get them the data they need.

THE COURT: And how is that different than any previous agreements between EEP and PeaceHealth?

MR. SCHOCK: I'd have to go look at the previous agreements.

THE COURT: Do you understand how what this describes is different from what was previously understood between EEP and PeaceHealth?

MR. JOHNSTON: Your Honor, my understanding is that this agreement, generally, and this provision, more specifically, reflects a commitment by both PeaceHealth and Eugene Emergency Physicians to a more collaborative leadership governance model. I don't know --

THE COURT: Between the parties?

MR. JOHNSTON: That's correct, yeah. And I think that -- that sort of transcends even -- there are a number of specific provisions, like the data transparency -- I can't tell you that, yeah, those words are different from what exists now, but I believe that they are. And I believe that the spirit of the agreement is different and more collaborative than it has been in the past. And that was the parties' goal anyhow.

THE COURT: Okay.

MR. JOHNSTON: The historic --

THE COURT: And forgive the interruption. This four-page term sheet -- I think it's been described as a four-page term sheet -- is that right? -- about --

MR. JOHNSTON: (No audible response.)

THE COURT: Can you e-mail it -- I want to be able to actually read it as well because, again, I may read it aloud if I'm not satisfied that these terms satisfactorily summarize what it is that the parties have agreed, but I want to be able to review it.

MR. JOHNSTON: I think the answer is yes. I have it on text, so I can text it to the Court. Or I can probably e-mail it to the Court after providing you with the summary and --

MR. SCHOCK: I have a copy that I could e-mail to the Court right now.

THE COURT: All right. Whose e-mail do you have? Do

you have my e-mail?

MR. SCHOCK: No, but we can do that right now.

THE COURT: Do you have the prop docs or my courtroom deputy's e-mail?

MR. SCHOCK: Ms. Davies' e-mail?

THE COURT: Yes. Why don't you send it to Ms. Davies. That way I won't receive spam from you, Mr. Schock, in the future.

MR. SCHOCK: I have a pretty good list serve that talks about Portland Trailblazers basketball, so you're missing out.

THE COURT: Probably not.

And Ms. Davies is paying attention to the proceedings, so she'll e-mail it to me as soon as she receives it from you, Mr. Schock.

MR. SCHOCK: Understood.

THE COURT: All right. So we're still at the -- I think we're done talking about data transparency.

MR. JOHNSTON: Yes. I don't have anything more to say about it.

THE COURT: Okay.

MR. JOHNSTON: And I should mention that the parties will and have agreed to provide a joint public statement with some more of the details, and potentially a public forum for questions and things like that.

And that is the summary of the material terms. And you'll see all those reflected in what Mr. Schock is e-mailing to you. But, again, it's really only the nonmaterial terms that we may need you or a settlement czar to help sort out. And, again, the agreement does not involve Apollo or LEP.

THE COURT: Okay. And, Mr. Isaak, you agree that those are the material terms -- an ever-so-brief summary of the material terms of the agreement between Eugene Emergency Physicians and PeaceHealth?

MR. ISAAK: Insofar as I have not even read through the document comprehensively myself, because I have only received it within the last couple of hours and only learned about certain terms of the document within the last 10 or 20 minutes, to the best of my ability, I believe that Mr. Johnston's summary is accurate.

THE COURT: All right. So I got to fill the backstory. How is it that trial counsel was unaware that parties were engaged in negotiations? Tell me more about what happened, when it happened, and who was involved.

MR. JOHNSTON: Your Honor, we were involved in the negotiation, not directly in "What is this term? What is that term?" But in consultation with our folks yesterday --

THE COURT: When you say "our folks," who are you talking about?

MR. JOHNSTON: Eugene Emergency Physicians. And then

once the material terms of the agreement were reached --

THE COURT: And who at EEP was doing the negotiating?

MR. JOHNSTON: I believe it was Dr. Anderson and two others. And our involvement was consulting with the group into the late evening last night.

THE COURT: So --

MR. JOHNSTON: Meaning all of the doctors because it is a democratic group: One doctor, one vote. And so that is how --

THE COURT: So it's not a Republican form of government, is what you're telling me?

MR. JOHNSTON: It has some differences.

THE COURT: It's truly sort of from the days of Athens.

MR. JOHNSTON: That's right. That's right. And, you know, there may be different views, given how long it took, whether that's the best form of governance. But it was a robust and thoughtful discussion and interaction. So --

THE COURT: So --

MR. JOHNSTON: -- we were involved, but not directly.

THE COURT: EEP was having conversations internally with individual owners, and then they were engaged with PeaceHealth?

MR. JOHNSTON: Correct.

THE COURT: And these are the people that I think you

described, Mr. Isaak: Ms. Wall, Mr. Korth -- and there was one other person.

MR. ISAAK: Ms. Beymer.

THE COURT: Okay. And those negotiations were being conducted through the -- through the evening yesterday?

MR. JOHNSTON: That's correct.

THE COURT: All right. And -- but you were involved tangentially in some way?

MR. JOHNSTON: That is correct.

THE COURT: Okay.

MR. ISAAK: Well -- and, candidly, you know, I don't know and can't comment on Mr. Johnston's involvement, but he may have been more involved than I was. I was being kept apprised by in-house counsel generally that negotiations were ongoing.

There was basically no -- I mean, I'm not going to disclose attorney-client privilege, but there was basically no meaningful discussion with me about the business terms of the deal that was being negotiated, nor did I really have an interest in that topic.

And so there was certainly discussion at a high level yesterday about, "Well, what's going to happen with tomorrow's hearing? And what is the status of the litigation going forward?" But, in terms of the business terms, as I sit here right now, I still do not feel like I have had an opportunity

to review the business terms.

THE COURT: Okay. Well, I have them now.

I will note that the last page is signed by PeaceHealth -- is signed, as a representative for PeaceHealth, Mark Korth, chief -- chief transformation and litigation officer?

MR. SCHOCK: Integration officer.

THE COURT: Integration officer. Okay. On May 5th, 2026. And on behalf of the Eugene Emergency Physicians, Dr. Brad Anderson, "Title: President of EEP," this morning or at least after midnight. Okay.

Is it -- are you claiming that any of this is so confidential that it may not be read into the record?

MR. JOHNSTON: Your Honor, I think the primary concern of the parties probably relates to information that isn't really necessary or germane to anything that's of public interest; and, that is, specifically, the hours and the rates. Those -- those pieces of information would typically be kept quite confidential as trades secrets, but --

THE COURT: The problem is we have a record already that is full of this kind of information.

MR. ISAAK: Yeah, but nothing in the -- there's no legal issue in this case that relates to the bilateral deal for prospective services and the terms of pricing and hours and rates between the two private entities, PeaceHealth and EEP.

And --

THE COURT: Okay. This is what I'm going to do. I'd like to just move forward. I'm going to start with identifying the heading and then -- do you have it in front of you, Mr. Isaak?

MR. ISAAK: I have it on Mr. Schock's laptop.

THE COURT: Okay. I'm going to give you an opportunity to tell me if there's a provision within that particular heading that ought not to be read aloud, and I'll consider it.

"Transaction Proposal," any issues with reading aloud Mr. Johnston?

MR. JOHNSTON: No issues on the part of plaintiffs, Your Honor.

THE COURT: Mr. Isaak.

MR. ISAAK: No objection, Your Honor.

THE COURT: All right. "Transaction Proposal: PeaceHealth, a Washington nonprofit corporation, and Eugene Emergency Physicians, PC, an Oregon professional corporation, desire to explore transaction structures to move past prior operational and governance challenges, for example, closure of University District, and establish improved collaboration, transparency, and alignment to support high quality emergency care for patients, known as the purpose at PeaceHealth Cottage Grove Community Medical Center and PeaceHealth Sacred

Heart Medical Center at RiverBend. This transaction proposal is confidential."

MR. ISAAK: And I will note that there's also heading on the document that it's confidential and subject to Rule 408.

THE COURT: Is that going to be argued as a basis for not reading this into the record?

MR. ISAAK: Well, Your Honor's already heard our objection that we don't think the document is -- should be -- the document contains confidential information. The settlement negotiations are ongoing. We don't think the document -- it's appropriate to read the document into the record. I understand Your Honor has perhaps a different view about that, but we've made that objection and stand on it.

THE COURT: Okay. I understand the objection. Is there a specific objection to "Core Principles in Support of Shared Purpose"?

MR. ISAAK: Are you just asking about the single sentence under that heading?

THE COURT: No. One, two, three -- one, two, and three for now.

MR. ISAAK: No objection.

THE COURT: And does the transaction proposal refer to RiverBend? It refers to PeaceHealth Cottage Grove and PeaceHealth -- oh, at RiverBend. Okay. Thank you. Thank you. Thank you. All right.

All right. So "Part I, Core Principles in Support of Shared Purpose: PeaceHealth has identified the following core principles that would support the foregoing purpose. These core principles would apply regardless of the selected transaction structure.

"Quality Performance Indicators" -- and were those the data transparency points that you read before, Mr. Johnston?

MR. ISAAK: No.

MR. JOHNSTON: I don't think so. I think there is a specific provision that contemplates the data transparency.

MR. SCHOCK: That's Section 5, Your Honor.

THE COURT: So "Quality Performance Indicators: PeaceHealth and emergency medicine physicians and clinicians will adopt objective, measurable metrics consistent with PeaceHealth's request for proposal materials and national benchmarks.

"PeaceHealth and emergency medicine physicians and clinicians will discuss incremental targets and long-term goals for performance. Quality performance indicators will be evaluated monthly.

"Categories of performance indicators will include, at a minimum, the following: ED arrival time to provider, patients left without being seen, patient satisfaction, usage of standard ED notation in EPIC, and wall time, and will be

subject to annual updates and/or rebasing. Payments will be made on a biannual basis.

"Consulting report" -- or excuse me -- "Consulting Support: PeaceHealth may, at their discretion, engage a third-party consultant to provide consulting services, associated development of quality performance indicators, operational assessments, measurements, and performance improvement.

"PeaceHealth and EEP will work in good faith to evaluate and implement reasonable recommendations from consultant, subject to operational feasibility and regulatory requirements, patient safety considerations, and other -- and other conditions.

"Emergency medicine physicians and clinicians will be responsible for developing associated action plans, which will be tracked, updated and shared with all parties on a monthly basis. For the avoidance of doubt, consultant's role shall be strictly limited to consulting service.

"Consultant shall have no role or authority with respect to physician management, clinician management, or any other matters not expressly set forth in the consulting agreement."

And has that consultant been identified?

MR. ISAAK: No, Your Honor.

THE COURT: "Three, Establishment of Physician Leader

of the Day and Clinician in Triage: On a timeline established by PeaceHealth and following any input PeaceHealth elects to obtain from consultant, PeaceHealth and EEP shall develop position descriptions for the physician leader of the day and clinician in triage roles.

"All position descriptions, appointments, and schedules shall be subject to PeaceHealth's approval. PeaceHealth will determine the number of hours allocated to each role. Compensation rates will be mutually agreed on and subject to a fair market value determination.

"PeaceHealth and EEP will jointly agree on metrics for measuring the performance of the physician leader of the day and clinician in triage for purposes of exclusivity triggers as outlined below.

"Four" -- I didn't ask you about any specific objections to four, Mr. Johnston.

MR. JOHNSTON: Your Honor, our only objections, again, would be just to this -- the rates and the hours, those things that would otherwise be considered trade secrets. But we don't have objections to anything else.

THE COURT: So rates and hours, I'm not seeing anything -- any particular numbers identified in four. Is there something more general about rates and hours that -- that are -- that is identified in number four that you want me to consider avoiding reading aloud?

MR. JOHNSTON: No. All I'm saying is you don't have to ask us anymore. When you get to the portion that includes the rates and hours, that's the only piece of this that -- that we have concerns with.

THE COURT: Any specific objections to number four, Mr. Isaak?

MR. ISAAK: No, Your Honor.

THE COURT: All right. And I am mindful of the heading at the top. And I've attempted to weigh the -- both the interest of the public in understanding what is at play here, what has been agreed to, with also -- and I understand that this agreement has not been ever made part of any of the record to date.

But, over four days of hearings, these topics have been extensively covered by almost every witness that has testified in one way or another. For example, the -- Dr. Ruscher had discussed very explicitly on the stand yesterday about the issues around physician leader of the day and clinician in triage, or at least having a point person, and that's what I understand that might mean.

So whether the parties were aware of what was going on or not, it seemed like the foundation for resolution was developing in real time on the witness stand by several -- several of the involved -- involved decision-makers in this settlement.

If there is something in this agreement that was not specifically a subject of any of the testimony, I'll be mindful of trying to catch that and address whether it needs to be read aloud.

"Leadership Governance" -- this is number four -- "No less than monthly meetings with the applicable hospital chief executive, chief medical officer, emergency department director, and other PeaceHealth leaders as PeaceHealth may appoint from time to time. Meetings will include formal agendas and include a formal review of action plans and action plan performance.

"No less than monthly operational emergency department meetings to include nursing, EEP, and PeaceHealth leaders.

"No less than biannual meetings with a representative from PeaceHealth system leadership to review performance improvement plans of both PeaceHealth hospital administration and emergency physicians and clinicians."

Returning to the consulting support, it provides that PeaceHealth may retain a consultant; is that right?

MR. ISAAK: Yes.

THE COURT: Does it involve EEP's engagement with a consultant? Does this agreement address that?

MR. JOHNSTON: Not beyond just collaboration with PeaceHealth. But if Your Honor's getting to --

THE COURT: I'm trying to understand if --

MR. JOHNSTON: What we looked at with PME, MSO, that is not contemplated here. PeaceHealth's free to hire anybody they want to for anything they want to, but --

THE COURT: Well, are you sure about that? 'Cause it might very well be that Senate Bill 951 does put some limits on what PeaceHealth might be able to do with a consultant, if you can call it a consultant, or an MSO. I just want to make sure that -- I mean, there may be still questions about what 951 says that -- that parties can do.

So I'm not suggesting, and I'm not making a finding, that whatever you're contemplating in this consulting paragraph is in violation of Senate Bill 951. I just want to make sure 951 doesn't disappear from this framework. It is -- it is the terrain now.

MR. JOHNSTON: And I think we're in agreement, Your Honor. The reason I said in the beginning that, in our view, this is all well within the confines of 951, that is because the agreement that has been laid out for you is PeaceHealth with EEP providing medical services.

That's the relationship, and that's the universe of the relationship that is being agreed to here. All this says is if PeaceHealth wants to hire somebody to give it advice, okay.

THE COURT: Any part of this agreement either

obligate, suggest, or encourage EEP to retain an MSO for assistance in managing operations?

MR. JOHNSTON: I don't believe so, Your Honor.

THE COURT: "Five, Data Transparency and Reporting: Emergency medicine physicians and clinicians and PeaceHealth will share quality data, throughput data, patient experience data, length of stay, staffing turnover, action plan performance, and other applicable metrics.

"PeaceHealth will consult with emergency medicine physicians and clinicians on the appropriate data and reporting metrics to be disclosed to medical executive committees, community health boards, community stakeholders, government officials, and other applicable stakeholders.

"Number six, Medical Director Appointments and Removals" -- and you told me that I didn't need to ask you anymore, Mr. Johnston.

MR. JOHNSTON: Correct, but you're welcome to. I'll be here all morning.

THE COURT: That was a passive-aggressive question on my part.

Mr. Isaak.

MR. ISAAK: No objection.

THE COURT: "PeaceHealth will have the right to appoint and remove emergency department medical directors.

"Seven, Joint Public Statements" -- I think this was

already made in your summary -- "Promptly after agreeing to transaction terms, PeaceHealth and EEP will agree to issue a mutually acceptable joint public statement and participate in a media conference that conveys the intent of PeaceHealth and EEP to work collaboratively and in good faith to serve the Lane County community and with a shared commitment of quality, safety, stability, and community trust.

"PeaceHealth Harbor Medical Center" -- this is the center in Florence?

MR. ISAAK: Correct.

THE COURT: Objections -- I'm going to -- I'm going to keep asking.

MR. JOHNSTON: No objection, Your Honor.

THE COURT: Mr. Isaak.

MR. ISAAK: No objection.

THE COURT: "With a shared desire to coordinate emergency department services across all Oregon sites, PeaceHealth and EEP leadership will work collaboratively and in good faith to mutually develop plans to evaluate emergency department coverage at PeaceHealth's Peace Harbor Medical Center, subject to consultation with physicians and clinicians serving Peace Harbor Medical Center.

"PeaceHealth agrees not to transition emergency medicine physician and clinician services to a third party, other than EEP, for a period of one year from the effective

date of the definitive agreements."

Section 9, "Capital Spending," Mr. Johnston?

MR. JOHNSTON: No objection.

MR. ISAAK: Your Honor.

THE COURT: Mr. Isaak.

MR. ISAAK: No objection.

THE COURT: "Within one year, PeaceHealth will evaluate emergency room capacity needs and, as applicable, develop a multiyear plan to expand capacity to meet anticipated community needs. PeaceHealth will confer and collaborate with EEP on that evaluation."

Ten, "Acknowledgment of Emergency Department Status," Mr. Johnston?

MR. JOHNSTON: No objection, Your Honor.

THE COURT: And Mr. Isaak.

MR. ISAAK: No objection.

THE COURT: "EEP acknowledges that it is choosing to serve PeaceHealth Lane County emergency departments with full awareness and acceptance of previously identified physical constraints, anticipated growing patient volumes, and clear community expectations of improved throughput and patient experience."

11, "Legal Proceedings," Mr. Johnston?

MR. JOHNSTON: No objection, Your Honor.

THE COURT: Mr. Isaak.

MR. ISAAK: No objection.

THE COURT: "The parties agree on the material terms of the future professional services agreement as described herein. On May 6th, 2026, the parties will notify the Court that they have resolved this dispute and will request that the Court allow 14 days for the finalization of the professional services agreement and dismissal of the litigation.

"The parties agree that any disputes over the remaining nonmaterial terms will be submitted to a federal settlement judge and that the judge's determination will be final and binding.

"Part II, Potential Transaction Structures to Advance Shared Purpose: The parties remain open to discussing other structures and/or compensation methodologies, including PeaceHealth employment of emergency medicine physicians and clinicians.

"Contract Extension" -- I do note that there is some sections with respect to compensation that I will not read into the record. That's Section 12(b). But 12 and 12(a), any objections?

MR. ISAAK: No objection.

MR. JOHNSTON: No objection, Your Honor.

THE COURT: "Contract Extension: PeaceHealth would provide contract extensions for CGMC," which is Cottage Grove Medical Center, "and RiverBend with appropriate revisions to

include items outlined above and mechanisms for shared accountability.

"The extensions would contemplate the following provisions, in addition to customary contract provisions, with compensation subject to a fair market value determination.

"The contract extensions would be for three years, including a provision for termination without cause on 180 days' notice, which either party may trigger any time after one calendar year from execution of the definitive agreements."

Is that after the first three years, or at -- within any three-year contract can it be terminated with six months notice?

MR. JOHNSTON: Yeah, I believe it's after one year that provision comes into play, Your Honor.

THE COURT: Is that, Counsel, your understanding as well?

MR. ISAAK: (No audible response.)

THE COURT: All right. So there's a three-year contract; but it can be terminated after the first year, as long as there's six months' notice provided?

MR. SCHOCK: Correct.

THE COURT: So does that mean that, within six months of the three-year contract, notice can be provided for termination after that first year of -- after the fulfillment of the first year's contract terms? Or is it that you can't

give notice until -- the six-month notice until after one year of the contract?

MR. ISAAK: Yes. So our understanding is that the notice would have to be given after the first year. But, you know, these are the very types of details that we would fill out with more specificity in a longer form agreement.

THE COURT: Well, assuming you catch it.

MR. ISAAK: Fair enough.

MR. JOHNSTON: That's our understanding also, Your Honor.

THE COURT: That the six-month notice can only be provided after the first year has been completed?

MR. JOHNSTON: Correct.

THE COURT: All right.

MR. ISAAK: And we would object to both (b) and (c).

THE COURT: And, given that the -- I believe there's been discussion about that, I will not read those into the record. I don't see them as necessary for -- for ensuring full transparency of the terms of conduct and performance.

MR. SCHOCK: And, Your Honor, there are also some rates of compensation in section (d) as well.

THE COURT: So the "Recruiting Support" -- and that's (d) that you just described -- provides that "PeaceHealth and EEP will agree on terms of PeaceHealth providing reasonable recruiting support, to include compensation to locum tenens

staffing." So the idea is that some locums will -- locum clinicians will be used to help with staffing?

MR. ISAAK: Yes.

MR. SCHOCK: Correct.

THE COURT: Okay. "Part III, Miscellaneous Concepts. Definitive Agreements: PeaceHealth will promptly prepare definitive agreements consistent with this proposal."

How about 14? Any objections, Mr. Johnston?

MR. JOHNSTON: No objection, Your Honor.

MR. ISAAK: No objection.

THE COURT: "Nonbinding Nature: Limited Binding Provisions (Binding). Other than this section, this proposal is nonbinding. No obligation to proceed shall exist unless and until one or more definitive agreements are executed.

"The existence and contents of this proposal, and all nonpublic information exchanged in connection with it, shall be treated as confidential and used solely for purposes of evaluating and negotiating the definitive agreements, subject to disclosures required by law or as mutually agreed by the parties.

"This proposal may be executed in counterparts and delivered electronically, each of which shall be deemed an original. This proposal shall be governed by and construed in accordance with the internal laws of the State of Oregon."

"The parties have executed this proposal as of the

last date first set forth below," and that was -- that is signed by Mark Korth and Dr. Brad Anderson.

MR. SCHOCK: Your Honor, I have a copy of the agreement, if it would be helpful.

THE COURT: Thank you.

Thank you.

And, Dr. Anderson, you're in the courtroom. Can you just stand up by the microphone here, wherever there might be a live one.

You've been in the courtroom. You've heard me recite several of the terms of this transaction proposal; is that correct?

DR. ANDERSON: That's correct.

THE COURT: And you're a signatory. You signed this document on the last page?

DR. ANDERSON: Yes, I did.

THE COURT: And do you agree that the summary that I've provided is an accurate summary of the terms that you, on behalf of EEP, have agreed to with PeaceHealth?

DR. ANDERSON: Yes, I do.

THE COURT: All right. Thank you, Doctor. You're welcome to take your seat again.

Can I have a stand-in for someone who's going to acknowledge that these -- Counsel, give me your full name again please.

MS. COCKERILL: Sarah Cockerill.
THE COURT: Last name?
MS. COCKERILL: Cockerill, C-o-c-k-e-r-i-l-l.
MR. ISAAK: Cockerill.
THE COURT: One more time.
THE WITNESS: Cockerill.
THE COURT: And spell it.
MS. COCKERILL: C-o-c-k-e-r-i-l-l.
THE COURT: Cockerill. All right.
Ms. Cockerill, you're counsel for PeaceHealth?
MS. COCKERILL: In-house counsel for PeaceHealth.
THE COURT: In-house counsel for PeaceHealth.
And were you involved in helping develop this term sheet?
MS. COCKERILL: I was.
THE COURT: All right. And was my summary an accurate summary of those material terms that were discussed here in court on this record?
MS. COCKERILL: It was.
THE COURT: And is it your understanding that PeaceHealth is agreeing to those terms as I've recited from this term sheet?
MS. COCKERILL: Yes.
THE COURT: All right. Thank you.
Anything else that we need to address on this record

today? I take it that I will receive some additional documents or settlement agreements or notification in 14 days.

I will stay any written opinion work until I've received notice that this case is -- has been resolved on all of its terms, at least for the next 14 days.

Otherwise, if I receive notice that the parties have not reached some final agreement, despite at least these terms being memorialized and acknowledged as terms agreed to, until I receive notice that the agreement has fallen through, then I will then begin -- well, I will complete the work of putting my opinion together.

MR. ISAAK: And --

THE COURT: Any other housekeeping matters that we need to take up, Mr. Isaak?

MR. ISAAK: Yeah, Your Honor. Just for the avoidance of doubt, we would ask that all other deadlines in the case be suspended for the 14-day period. I know we have, like, a brief that's due tomorrow. And I'm not sure if there's any other deadlines in addition to that.

THE COURT: Yes. Any due dates for reply briefs or any other briefing schedules that have been put in place earlier are vacated until further determination of the need for those -- those briefings to be submitted.

Counsel, I want to make sure you all understand a record existed independent of any agreement that all of you

have reached. Do not ask that I order it sealed because I won't. This record is part of that which was litigated before this Court, and it is -- it is determined.

My findings orally on Monday are part of the record. They were not musings. They were not hypotheses or -- or suggestions. They are real and concrete. Don't ask me to reconsider or vacate them. They are not part of your agreement, and that includes my credibility findings.

Anything else on housekeeping that needs to be addressed?

Mr. Bradford.

MR. BRADFORD: Your Honor, just to the last point, we take seriously the Court's finding about credibility. And, as an officer of this Court, for myself and my co-counsel here at table, it's important the Court know that I would not and have not engaged in or encouraged any witness to violate its oath to the Court.

The Court's purview is to do credibility determinations, and it's done so. But, speaking for myself -- and I think that if Dr. Patel and Dr. Chapman were here, they would say the same thing -- we're not interested --

THE COURT: I'm sorry. What would they say?

MR. BRADFORD: That they have testified honestly to the best of their ability and that they were given no other instruction other than to do so. I have other matters in front

of this Court. I'm an officer of this Court. I live and work in this community, and I take that duty to the Court very seriously, as do my co-counsel.

And I'm not -- the Court has the final word about credibility, and I'm not interested in asking it to reconsider. But it's important to me, to my co-counsel, and to my clients that the Court know that we have represented to the best of our ability what we know to be the truth and wouldn't presume to do anything else.

THE COURT: I'm turning to some pages to -- I want to make sure that I properly and more completely address your points, Mr. Bradford, because they do deserve a response and -- so please bear with me.

(Pause in proceedings, 10:21 a.m. - 10:23 a.m.)

THE COURT: Plaintiffs' counsel, now that I've gone through your exhibits, I'm going to ask you to help me find the one I'm looking for. I believe it's in your binder. It is, I believe, a -- it's an ApolloMD sheet that describes -- and might have been with respect to Dr. Chapman's award for medical director of the year. And I'm not referring to Exhibit 43.

(Pause in proceedings, 10:23 a.m. - 10:24 a.m.)

THE COURT: And if either defense counsel hope to get out of here before 2:00 p.m. and you know what I might be talking about, you're welcome to assist.

MS. HILSHER: Your Honor, I think it may be --

MR. SCHOCK: Your Honor, I recall it.

THE COURT: Ms. Hilsher.

MS. HILSHER: I think it may be attached to one of the declarations that was filed. So I'm going to look there.

THE COURT: You know, I think you are -- you are correct.

And then the question is whose declaration was it attached to?

It may be Laurie Parrish.

MS. HILSHER: That's what I believe, Your Honor. I'm still looking for it, but I think that's correct.

THE COURT: I found it, so let's see if I --

MS. HILSHER: Your Honor, it looks like it's Parrish declaration, paragraph two, Exhibit 1.

THE COURT: Yes. And the Exhibit 1 is what I'm looking at here.

On the very last -- page five of seven, Exhibit 1 to the declaration from Ms. Parrish, "Dr. Chapman's journey from healthcare IT to emergency medicine is the testament to the power of perseverance, service, and the pursuit of purpose. His story resonates deeply with those seeking to make a difference, not just through their work, but their commitment to others.

"At ApolloMD he has found a place where his values align with his vocation and where his passion for medicine

continues to inspire those around him. For physicians seeking to join a team where compassionate care and clinical excellence are not just goals, but daily practices, Dr. Chapman's story serves as a powerful example of what's possible at ApolloMD."

Exhibit 43, "Dr. Chapman joined ApolloMD in 2023 and currently serves as medical director at Riverside Medical Center in Illinois" -- and it goes on to explain his accomplishments.

So I preface this because I think I also -- my next comments because on Monday I told you there was a depth of material in this record that details the falsity of Dr. Chapman and Dr. Patel's testimony from the stand. You can't tell me one thing and write another and expect that I'm going to appreciate there is some nuanced difference between who is in charge of what.

And that was the -- that was the risk that Dr. Patel and Dr. Chapman ran when coming up to the stand, taking an oath, being subject to either contempt or perjury charges, which I won't refer them for investigation at this stage, especially if this case is now settled.

The offense was that they thought that they could stretch and bend the reality of control that Apollo exercises over their physicians in a way that would ameliorate any concerns of a violation of Senate Bill 951.

I think I also mentioned this on Monday, which is it

would've been better for them to have just simply have told the truth about what was happening. It would've been better if they actually read 951 before they submitted their response to the RFP.

There are ways to actually perform as an MSO legally in Oregon. They didn't do that by virtue of just simply setting up an LLC when they explicitly provide in their response to the proposal that it is a liability management mechanism.

It's, frankly, further -- I mean, it further compounds some sense of outrage that it's not liability against necessarily other big corporations; but I think, as Dr. Ruscher testified, it's liability against claims for injury from patients.

Dr. Chapman and Dr. Patel made a very conscious choice to try to deceive this Court under oath, and they'll suffer whatever consequences that are appropriate in whatever profession and licensing organizations they are a part of. That's not my concern.

Now, all of this is to go back to also your thoughts and comments. I'm not attributing any unethical or inappropriate or unprofessional conduct on the part of the lawyers in this room, that are sitting at this table. I don't know who's sitting in the gallery that might be a lawyer, so I won't let you off the hook.

But, look, I have been, frankly, grateful that I've had people of good will sitting here in front of me answering my questions. I've worked, I think, with all of you in one way or another, other than Mr. Schock and, actually, you, Mr. Bradford, and then your counsel pro hac vice counsel from Georgia.

But we are a small enough legal community to know that accountability comes round. But I don't think we're just doing the good work transactionally. I think we're all committed to trying to make sure that we leave the law in a better place than when we found it.

So I want to make it very clear. My ire is not directed to you, Mr. Popp -- and I really want to be able to pronounce your name appropriately before the end of the day.

MS. FALZARANO: Falzarano.

THE COURT: Falzarano.

MS. FALZARANO: Yes.

THE COURT: -- and Ms. Falzarano, Mr. Schock and Mr. Isaak, Mr. Rooke-Ley, Ms. Hilsher, and Mr. Johnston.

You know, I think it's also true that sometimes the cover-ups are always worse than just simply fessing up to what's really going on. I, frankly, think that if the parties had talked about Senate Bill 951 well in advance of what was happening, maybe there were some ways to work things out before having to come to me and testify under oath with falsities that

don't add up, given everything else that's in this record.

So it's a mixed bag. I'm not letting your witnesses off the hook, but I'm not holding you responsible for their decisions, as incredibly capable professionals themselves, to have been -- have been able to conform them -- conform their testimony behavior to testifying truthfully under oath, which they didn't -- they didn't.

Let me also say this, I mean, because I -- I mean, people are complicated. People are complicated. I don't doubt that Dr. Chapman wants to do good in the world and treat people and take care of them, but the business model got in the way of sort of the reason for being in the purpose, and not necessarily universally. It's just that in this instance, when they came up against Senate Bill 951, I think they lost sight of what mattered.

You know, and, to the extent that I understand the broad scope of the regulatory provisions and restrictions that Senate Bill 951 has in place, I think -- you know, and this is maybe where I'm dangerously venturing into commenting on policy -- I think it is a wise far-reaching decision that Oregon took in adopting 951 to protect patients and the medical profession from exactly what's happened in this case.

Counsel, 14 days. I'll look forward to receiving an update, status about how we're going to proceed. I've indicated to you I'm inclined to retain jurisdiction. If the

parties have issues with that or prefer some other outcome, I'm not going to keep you from being able to get the case settled.

But I will say that, by virtue of my intimate involvement in this case, if there are matters that need resolution, I think you'll be able to get in front of me a whole lot quicker than trying to schedule it in front of another special master or judge, by virtue of both my proximity in Eugene as well as my familiarity with the case. I'll leave it to you to work out those details.

In the meantime, we are adjourned. Be well.

* * *

(Court adjourned, 5-6-26 at 10:35 a.m.)

C E R T I F I C A T E

Stapleton, et al., v. PeaceHealth, et al.

Case No. 6:26-cv-00684-MTK

Motion Hearing

May 6, 2026

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR
___________________________________

Official Court Reporter Signature Date: 5/13/2026
Oregon CSR No. 14-0427 CSR Expiration Date: 6/30/2026